# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP1599 |
| COMPLETE TITLE: | E. Glen Porter, III and Highland Memorial Park, Inc., |
| | Plaintiffs-Appellants-Petitioners, |
| | v. |
| | State of Wisconsin, Laura Gutierrez and Wisconsin Funeral Directors Examining Board, Defendants-Respondents. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 378 Wis. 2d 117, 902 N.W.2d 566
PDC No:  2017 WI App 65 - Published

| | |
|---|---|
| OPINION FILED: | June 27, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 19, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | Patrick C. Haughney |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | |
| DISSENTED: | R.G. BRADLEY, J., and KELLY, J., dissent (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiffs-appellants-petitioners, there were briefs filed by *Thomas C. Kamenick*, *Richard M. Esenberg*, *Michael Fischer*, *Clyde Taylor*, and *Wisconsin Institute for Law & Liberty*, Milwaukee.  There was an oral argument by *Richard M. Esenberg.*

For the defendants-respondents, there was a brief filed by *Ryan J. Walsh*, chief deputy solicitor general, with whom on the brief were *Brad D. Schimel*, attorney general, and *Sopen B. Shah*, deputy solicitor general.  There was an oral argument by *Ryan J. Walsh*, chief deputy solicitor general.

An amicus curiae brief was filed on behalf of Institute for Justice by *Lee U. McGrath*, *Anthony B. Sanders*, and *Institute for Justice*, Minneapolis, Minnesota, with whom on the brief were *Erica Smith* and *Institute for Justice*, Arlington, Virginia.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP1599
(L.C. No. 2014CV1763)

STATE OF WISCONSIN : IN SUPREME COURT

E. Glenn Porter, III and Highland Memorial
Park, Inc.,

     Plaintiffs-Appellants-Petitioners,

  v.

State of Wisconsin, Laura Gutierrez and
Wisconsin Funeral Directors Examining Board,

     Defendants-Respondents.

**FILED**

**JUN 27, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 SHIRLEY S. ABRAHAMSON, J. This is a review of a published decision of the court of appeals affirming a judgment of the Circuit Court for Waukesha County, Patrick C. Haughney, Judge.[1]

---

[1] Porter v. State, 2017 WI App 65, 378 Wis. 2d 117, 902 N.W.2d 566.

¶2 The plaintiffs-appellants-petitioners, E. Glenn Porter, III, and Highland Memorial Park, Inc.,[2] challenge the constitutionality of two statutes: Wis. Stat. §§ 157.067(2)[3] and 445.12(6)[4] (2015-16).[5] The parties refer to these two statutes

---

[2] E. Glenn Porter, III, is the president and one of the principal owners of Highland Memorial Park, a cemetery located in New Berlin, Wisconsin. Mr. Porter and Highland Memorial Park shall be referred to collectively as "Porter."

[3] Wisconsin Stat. § 157.067(2) provides:

No cemetery authority may permit a funeral establishment to be located in the cemetery. No cemetery authority may have or permit an employee or agent of the cemetery to have any ownership, operation or other financial interest in a funeral establishment. Except as provided in sub. (2m), no cemetery authority or employee or agent of a cemetery may, directly or indirectly, receive or accept any commission, fee, remuneration or benefit of any kind from a funeral establishment or from an owner, employee or agent of a funeral establishment.

[4] Wisconsin Stat. § 445.12(6) provides:

No licensed funeral director or operator of a funeral establishment may operate a mortuary or funeral establishment that is located in a cemetery or that is financially, through an ownership or operation interest or otherwise, connected with a cemetery. No licensed funeral director or his or her employee may, directly or indirectly, receive or accept any commission, fee, remuneration or benefit of any kind from any cemetery, mausoleum or crematory or from any owner, employee or agent thereof in connection with the sale or transfer of any cemetery lot, outer burial container, burial privilege or cremation, nor act, directly or indirectly, as a broker or jobber of any cemetery property or interest therein.

[5] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

as the "anti-combination laws."  Generally, these laws prohibit the joint ownership or operation of a cemetery and a funeral home.  Porter argues that the anti-combination laws violate his rights to equal protection and substantive due process under the Wisconsin and United States constitutions.[6]

¶3   In the circuit court, the State moved for summary judgment.  It argued that rational basis scrutiny applied to Porter's claims because he had not alleged the creation of a suspect class or the violation of a fundamental right.  See Aicher ex rel. LaBarge v. Wis. Patients Comp. Fund, 2000 WI 98, ¶56, 237 Wis. 2d 99, 613 N.W.2d 849.  The State asserted that the anti-combination laws survived rational basis review because they were rationally related to three legitimate government interests: (1) preserving competition in the death care services industry; (2) protecting consumers from higher prices and poor services; and (3) reducing the potential for abuses from commingling of cemetery and funeral revenues.

¶4   The circuit court granted the State's motion for summary judgment.  It concluded that the anti-combination laws are constitutional because they are rationally related to a number of legitimate government interests, namely "preserving competition, avoiding commingling of funds, preserving consumer choices, avoiding higher prices, fostering personal service, [and] avoiding undue pressure on consumers . . . ."  The circuit

---

[6] U.S. Const. amend. XIV, § 1; Wis. Const. art. I, § 1.

court explained that it was "satisfied . . . that if there are arguments over whether some of this works or some of that doesn't work, it stands as proof then that there is a basis for the law . . . ."

¶5 Porter appealed. The parties disagreed on the proper scope of rational basis review and whether the anti-combination laws have a rational basis.

¶6 The court of appeals held that regardless of the scope of rational basis review employed, the anti-combination laws were not unconstitutional on either equal protection or substantive due process grounds.[7] The court of appeals explained that the anti-combination laws were rationally related to the legitimate government interests of protecting consumers and limiting the possibility for abuse of trusting requirements.

¶7 Applying the standard set forth in Mayo v. Wisconsin Injured Patients & Families Compensation Fund, 2018 WI 78, ___ Wis. 2d ___, ___ N.W.2d ___, we conclude that the anti-combination statutes do not violate the equal protection or due process clauses of the Wisconsin and United States constitutions. The anti-combination statutes are rationally related to the legitimate government interests of protecting the welfare of particularly vulnerable consumers and limiting or minimizing the manipulation of funds required to be held in trust by funeral directors and cemetery operators.

---

[7] Porter v. State, 2017 WI App 65, ¶2, 378 Wis. 2d 117, 902 N.W.2d 566.

¶8 Accordingly, we affirm the decision of the court of appeals.

I

¶9 E. Glenn Porter is the president and one of the principal owners of Highland Memorial Park, a cemetery located in New Berlin, Wisconsin. Porter would like to expand his business by operating a funeral establishment in conjunction with his existing cemetery operations. However, the anti-combination laws prevent him from doing so.

¶10 As a result, Porter filed the instant lawsuit, asserting the anti-combination laws are facially unconstitutional on both equal protection and substantive due process grounds.

¶11 In support of his equal protection challenge, Porter alleged that the anti-combination laws create anticompetitive, irrational, and arbitrary distinctions between classes of Wisconsin citizens in that only cemetery operators are prohibited from operating or obtaining ownership interests in funeral establishments, and only funeral directors are prohibited from obtaining ownership interests in cemeteries.

¶12 In support of his substantive due process challenge, Porter alleged that the anti-combination laws arbitrarily and irrationally prevent cemetery operators from owning an interest in a funeral establishment and owners and operators of funeral establishments from having an ownership interest in a cemetery.

¶13 As relief, Porter sought (1) a declaratory judgment that the anti-combination laws violate the equal protection and

5

due process clauses of the Wisconsin and United States constitutions; (2) an order permanently enjoining the State from enforcing the anti-combination laws; and (3) reasonable costs and attorney fees.

¶14 The State moved for summary judgment. It argued that rational basis scrutiny applied to both of Porter's claims because he had not alleged the creation of a suspect class or the violation of a fundamental right. The State asserted that the anti-combination laws were rationally related to three legitimate government interests: (1) preserving competition in the death care services industry; (2) protecting consumers from higher prices and poor service; and (3) reducing the potential for abuses from commingling of cemetery and funeral revenues.[8]

¶15 Porter argued that even if he has not definitively established that the anti-combination laws are unconstitutional, he has raised a genuine issue of material fact with regard to

---

[8] On appeal, the State asserts that the anti-combination laws are rationally related to two legitimate government interests: (1) protecting consumers from increased prices; and (2) limiting or minimizing the manipulation of funds required to be held in trust by funeral directors and cemetery operators.

As we explain below, we agree with the State that the anti-combination laws are rationally related to the two legitimate government interests articulated by the State on appeal.

Accordingly, we do not address whether the anti-combination laws are rationally related to any other legitimate government interests. A.O. Smith Corp. v. Allstate Ins. Cos., 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998).

whether the anti-combination laws actually advance the State's asserted interests.

¶16  In support of its motion, the State submitted a report authored by economics professor Jeffrey Sundberg, who rendered an opinion to a reasonable degree of professional certainty that the anti-combination laws serve the State's claimed interests.

¶17 Sundberg opined that the anti-combination laws "protect the interest of consumers" by "encourag[ing], or prevent[ing] the discouragement of, competition."  Sundberg explained that combination firms, if permitted, would "have an opportunity to significantly reduce the amount of competition they face" through a process called "foreclosure."  According to Sundberg:

> [A] cemetery with a financial interest in a funeral home could easily create an advantage by charging a normal or perhaps lower price for burials from its partner home, and a higher price for burials from other funeral homes.  This would allow the combination to achieve a higher market share and create a disadvantage for rival firms, as long as the number of cemeteries was limited.  This at least appears to be a consumer-friendly result, as long as it lasts.  However, as the combination captures more market share, the amount of competition will decline and the firm can then charge full prices that include the artificially higher cost of the burial plot previously charged to other firms.  Prices faced by consumers will rise.

¶18  Although Sundberg conceded that foreclosure is "not a common result," he asserted that it is "most likely to work in a case where one part of the integrated firm is a special resource, one that cannot easily be replicated by others." Sundberg explained that "[t]his is likely to be the case with

7

cemeteries" because there are far fewer cemeteries in the United States than funeral homes.  Sundberg continued:

> Given the land, capital, and regulatory requirements, it is reasonable to believe that entering the cemetery industry is much more difficult than starting a new funeral home.
>
> As a result, a funeral home that is owned by, or owns, a cemetery has access to a scarce resource, one that gives it an advantage over other funeral homes.  As other firms exit the market it becomes advantageous for the combination to use its market power to extract more money from consumers, perhaps by charging higher prices or perhaps by simply encouraging distraught consumers with few alternatives to add more features to their loved one's service.
>
> The small number of cemeteries and the barriers to creating new ones, especially in urban areas, give a special advantage to well-capitalized large firms that can afford to purchase multiple funeral homes.  With enough funeral homes, it may be profitable for a cemetery to completely exclude burials from funeral homes owned by others.

¶19 As to whether the anti-combination laws limit or minimize the manipulation of funds required to be held in trust by funeral directors and cemetery operators, Sundberg opined that the anti-combination laws "reduce[] the potential for abuses from commingling of cemetery and funeral revenues."  He explained:

> [T]here is some potential for abuse when combinations exist.  The amount of money set aside is supposed to be 15% of the value of [a cemetery] plot.  By providing funeral services as well as cemetery plots, a firm could potentially exploit [the trusting requirement for cemetery plots] by increasing the price of something like burial vaults and reducing the price of the plot itself, collecting the same amount of revenue while being required to set aside less

8

money for perpetual care, without actually reducing the actual expenses of perpetual care.

Sundberg opined that having a single firm selling more categories of merchandise "makes the commingling potentially easier to disguise, if a firm were interested in doing so." At a minimum, Sundberg asserted, "detecting such activity would be more difficult" without the anti-combination laws. Sundberg also explained, without contradiction, that having more categories of merchandise makes the commingling of funds with different trusting requirements easier to disguise and more difficult to detect.

¶20 In response, Porter submitted a report and affidavit authored by economics professor David Harrington, who opined to a reasonable degree of professional certainty that the anti-combination laws do not actually advance the State's claimed interests.

¶21 Harrington opined that the anti-combination laws actually increase the cost of death care services to Wisconsin consumers. Harrington explained that it is less costly to produce funeral services at combination firms because those firms are able to benefit from economies of scale and scope. Harrington also disputed Sundberg's assertion that permitting combination firms would lead to foreclosure:

> Perhaps the best evidence for this point is [the] fact that combination firms already exist and do business in almost all of the states. Although I have not deliberately investigated the possibility, I can say that over the many years I have studied the industry I have not seen any evidence that combination firms actually engage in the kind of exclusionary behavior

that [Sundberg] says that he fears. If they did so, their conduct would likely have been the subject of a challenge under the antitrust laws. I am not aware that any such case has ever been brought in the states where combination firms are permitted to do business.

¶22 Harrington further opined:

Wisconsin has a state statute (Wis. Stat. § 157.11[9]) designed to ensure that cemeteries are cared for in

---

[9] Presumably, Harrington is referring to Wis. Stat. § 157.11(9g), which reads as follows:

(9g) Care fund for cemetery lots.

(a)

1. Except as provided in ss. 66.0603(1m)(c) and 157.19(5)(b), funds that are received by a cemetery authority for the care of a cemetery lot shall be invested in one or more of the following manners:

a. Deposited and invested as provided in s. 157.19.

c. If not invested as provided in subd. 1.a., otherwise deposited by the cemetery authority in an investment approved by the cemetery board if the care funds are segregated and invested separately from all other moneys held by the cemetery authority.

2. The manner in which the care funds are invested may not permit the cemetery authority to withdraw the care fund's principal amount. The income from the investment of a care fund for the care of cemetery lots may be used only to maintain the cemetery lots and grounds, except that if the amount of income exceeds the amount necessary to maintain the cemetery lots or grounds properly, the excess amount may be used to maintain any other portion of the cemetery, including mausoleums.

(b) Anyone having in custody or control any cemetery care trust fund received other than by testament shall, upon demand, deliver it to the cemetery authority to be handled as provided in this subsection.

(continued)

perpetuity. This statute applies to cemeteries operated by combination firms to the same extent that it applies to any cemetery. Abuse or misuse of funds is no more or less likely simply because a cemetery firms [sic] operates a funeral establishment. By defendant's logic, a cemetery should be precluded from operating a flower shop because of the possibility that funds could be comingled [sic]. Wisconsin law does not prohibit cemeteries from engaging in the flower business or from selling any other complementary goods other than funeral services.

¶23 The circuit court granted the State's motion for summary judgment. It concluded that the anti-combination laws are constitutional because they are rationally related to the legitimate government interests of "preserving competition, avoiding commingling of funds, preserving consumer choices, avoiding higher prices, fostering personal service, [and] avoiding undue pressure on consumers." The court explained that it was "satisfied . . . that if there are arguments over whether some of this works or some of that doesn't work, it stands as proof then that there is a basis for the law . . . ." The circuit court concluded that it did not "need to go beyond summary judgment and to have a trial on the matter,

---

(c) Except as provided in sub. (11), any cemetery authority that sells a cemetery lot on or after November 1, 1991, shall deposit 15 percent of each payment of principal into a care fund under par. (a) within 30 business days after the last day of the month in which the payment is received, except as provided in sub. (7)(d) and s. 157.115(2)(f). The total amount deposited must equal 15 percent of the total amount of all payments of principal that have been received, but not less than $25.

11

because . . . there's enough information before the court that the court finds the law is constitutional."

¶24 Porter appealed. He argued that the anti-combination laws must be examined under the "rational basis with teeth" standard that this court applied in Ferdon ex rel. Petrucelli v. Wisconsin Patients Compensation Fund, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440. Under this standard, Porter argued, the State must demonstrate that the anti-combination laws bear a "real and substantial connection" to a legitimate government purpose.

¶25 The court of appeals held that regardless of the standard of review employed (i.e., traditional rational basis or "rational basis with teeth"), the anti-combination laws were not unconstitutional on either equal protection or substantive due process grounds. The court of appeals explained that the anti-combination laws were rationally related to the legitimate government interests of protecting consumers and limiting the possibility for abuse of trusting requirements.

¶26 The court of appeals also held that a remand for further proceedings would be inappropriate. It explained that although evidence, including expert opinions, had been presented in the instant case, "the court must determine the relative merit of that evidence during a constitutional challenge."[10]

II

---

[10] Porter, 378 Wis. 2d 117, ¶48.

12

¶27 We begin by setting forth the general standards of review and principles of law applicable to Porter's constitutional challenges.

¶28 Porter raises facial challenges to the constitutionality of the anti-combination laws. "A facial constitutional challenge to a statute is an uphill endeavor." State v. Dennis H., 2002 WI 104, ¶5, 255 Wis. 2d 359, 647 N.W.2d 851. To succeed, Porter must demonstrate that the anti-combination laws cannot be constitutionally enforced under any set of circumstances; that is, "a facial challenge is '[a] claim that a statute . . . always operates unconstitutionally[.]'" Voters with Facts v. City of Eau Claire, 2018 WI 63, ¶60, ___ Wis. 2d ___, ___ N.W.2d ___ (quoting Olson v. Town of Cottage Grove, 2008 WI 51, ¶44 n.9, 309 Wis. 2d 365, 749 N.W.2d 211). The constitutionality of a statute presents a question of law that we review independently. Aicher, 237 Wis. 2d 99, ¶18.

¶29 In assessing Porter's constitutional challenges, we presume the anti-combination laws are constitutional. Aicher, 237 Wis. 2d 99, ¶18; Riccitelli v. Broekhuizen, 227 Wis. 2d 100, 119, 595 N.W.2d 392 (1999). "The court indulges every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality." Aicher, 237 Wis. 2d 99, ¶18; State ex rel. Hammermill Paper Co. v. La Plante, 58 Wis. 2d 32, 46-47, 205 N.W.2d 784 (1973). This strong presumption of statutory constitutionality "is the product of our recognition that the judiciary is not positioned

13

to make the economic, social, and political decisions that fall within the province of the legislature." Aicher, 237 Wis. 2d 99, ¶20; State ex rel. Carnation Milk Prods. Co. v. Emery, 178 Wis. 147, 160, 189 N.W. 564 (1922).

### III

¶30 We now turn to the merits of Porter's constitutional challenges. We first establish the scope of rational basis review applicable to Porter's claims. We then apply that standard to the anti-combination laws.

### A

¶31 Porter challenges the constitutionality of Wis. Stat §§ 157.067(2) and 445.12(6). Generally speaking, these statutes prohibit the joint ownership or operation of a cemetery and a funeral home.

¶32 The parties dispute how rational basis scrutiny is to be applied under the specific circumstances of the instant case.

¶33 Porter argues that the anti-combination laws must be examined under the "rational basis with teeth" standard that this court applied in Ferdon ex rel. Petrucelli v. Wisconsin Patients Compensation Fund, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440. Porter argues that under this standard, the State must demonstrate that the anti-combination laws bear a "real and substantial connection" to a legitimate government purpose. The State argues that Porter's constitutional challenges should be analyzed under the traditional rational basis test, but that the anti-combination laws pass constitutional muster under either traditional rational basis or "rational basis with teeth."

14

¶34 On the same day that we heard arguments in the instant case, we heard arguments in Mayo v. Wisconsin Injured Patients & Families Compensation Fund, 2018 WI 78, ___ Wis. 2d ___, ___ N.W.2d ___.[11] Noting that "[t]he analysis under both the due process and equal protection clauses is largely the same[,]"[12] the Mayo court disposed of an equal protection and due process challenge to Wis. Stat. § 893.55 under the following articulation of the rational basis standard:

> A classification created by legislative enactment will survive rational basis scrutiny upon meeting five criteria:
>
> (1) All classification[s] must be based upon substantial distinctions which make one class really different from another.
>
> (2) The classification adopted must be germane to the purpose of the law.
>
> (3) The classification must not be based upon existing circumstances only. [It must not be so constituted as to preclude addition to the numbers included within a class.]
>
> (4) To whatever class a law may apply, it must apply equally to each member thereof.
>
> (5) That the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the

---

[11] We scheduled the release of the instant opinion to be contemporaneous with the release of our opinion in Mayo v. Wisconsin Injured Patients & Families Compensation Fund, 2018 WI 78, ___ Wis. 2d ___, ___ N.W.2d ___. We apply Mayo in the instant case.

[12] Mayo, ___ Wis. 2d ___, ¶39 (quoting State v. Quintana, 2008 WI 33, ¶78, 308 Wis. 2d 615, 748 N.W.2d 447).

15

> propriety, having regard to the public good, of substantially different legislation.

Mayo, ___ Wis. 2d ___, ¶42; see also Aicher, 237 Wis. 2d 99, ¶58.

¶35 This five-step analysis is the proper standard to apply in the instant case to Porter's constitutional claims. See Mayo, ___ Wis. 2d ___, ¶¶39, 42.

B

¶36 Applying the five-step analysis relied upon in Mayo, we conclude that the anti-combination laws do not violate equal protection or substantive due process.

¶37 First, we determine whether the classifications created by the anti-combination statutes are based upon "substantial distinctions" which makes the classes different from one another. This step is satisfied.

¶38 Cemetery operators and funeral establishment directors both serve a particularly vulnerable class of consumers: those who have suffered the loss of a loved one. Moreover, certain goods and services in the death care industry are subject to statutory trusting requirements so that persons can pay for them "pre-need" with assurance that the necessary funds will exist when the need arises. See, e.g., Wis. Stat. §§ 157.11(9g)(c) (requiring sellers of cemetery plots to entrust 15% of the principal paid to cover perpetual care expenses); 445.125(1)(a)1. (requiring sellers of caskets to hold in trust 100% of funds paid before death until the "death of the potential decedent"). Thus, the classifications created by the

16

anti-combination laws are based upon "substantial distinctions" that make the classes different from one another.

¶39 Second, we determine whether the classifications adopted are germane to the purpose of the laws.  This step is satisfied.

¶40 The State argues that the anti-combination laws are rationally related to two legitimate government interests: (1) protecting consumers from increased prices; and (2) limiting or minimizing the manipulation of funds required to be held in trust by funeral directors and cemetery operators.[13]

¶41 As the court of appeals correctly explained, "[b]oth interests conceivably serve to protect consumers in markets encountered by virtually everyone, and at a time in their lives when they may be particularly vulnerable to questionable marketing influences due to the loss of loved ones."  Porter, 378 Wis. 2d 117, ¶34.

¶42 Moreover, the State's expert, Jeffrey Sundberg, explained at length how the anti-combination laws advanced these legitimate government interests.  See supra ¶¶16-19.

¶43 As to the State's first articulated interest (i.e., protecting consumers), Sundberg opined that without the anti-

---

[13] Because we agree with the State that the anti-combination laws are rationally related to the two legitimate government interests posited by the State, we do not address whether the anti-combination laws are rationally related to any other legitimate government interests.  A.O. Smith Corp., 222 Wis. 2d at 491.

combination laws, combination firms would, in the short run, offer lower prices than stand-alone funeral homes and limit stand-alone firms' access to cemeteries. This would drive stand-alone funeral homes from the market at which point combination firms would increase their prices.

¶44 As to the State's second articulated interest (i.e., limiting or minimizing the manipulation of funds required to be held in trust), Sundberg also opined that the potential for abuse arises when a combination firm sells both cemetery plots and other merchandise subject to higher trusting requirements because such a firm could charge more for merchandise that is subject to a lower trusting requirement and lower its prices for merchandise that is subject to a higher trusting requirement. Doing this would give the combination firm immediate access to more funds at the risk that funds are not available when the pre-need purchaser dies and needs the paid-for merchandise.[14]

¶45 Accordingly, the classifications created by the anti-combination laws support the purposes of those laws.

¶46 Third, we determine whether the statutory classifications are based solely upon existing circumstances. The anti-combination laws do nothing to "preclude addition to

---

[14] We do not recite Porter's contrary evidence because doing so would be unnecessary. Sundberg's report provides an independent and sufficient basis for concluding that the anti-combination laws advance legitimate government interests, and Harrington's report and affidavit to the contrary does not compel a different conclusion.

the numbers included within a class" and "allow expansion of the class[es]" to include additional members in the future. Aicher, 237 Wis. 2d 99, ¶69. Therefore, the third step is satisfied.

¶47 Fourth, we determine whether all members of each class are treated equally. There is nothing in the anti-combination laws that would treat some cemetery operators differently than other cemetery operators. See Wis. Stat. § 157.067(2). Further, there is nothing in the anti-combination laws that would treat some funeral directors differently than other funeral directors. See Wis. Stat. § 445.12(6). Therefore, the fourth step is satisfied.

¶48 Fifth, and finally, we determine whether the characteristics of each class are so different from those of the other class to "reasonably suggest" that the legislation is for the public good. This step is satisfied.

¶49 Both funeral establishment directors and cemetery operators serve a particularly vulnerable class of consumers: those who have suffered the loss of a loved one. Both funeral establishment directors and cemetery operators are subject to trusting requirements for the products and services they sell. The unique characteristics of funeral establishment directors and cemetery operators "reasonably suggest" that the anti-combination laws serve the public good by protecting vulnerable consumers and making it more difficult for funeral directors and cemetery operators to disguise the commingling of funds with different trusting requirements.

¶50  According, we conclude that the anti-combination laws are constitutional.[15]

IV

¶51  We conclude that summary judgment was properly granted in favor of the State.   The anti-combination statutes do not violate the equal protection or due process clauses of the Wisconsin and United States constitutions.   The anti-combination statutes are rationally related to the legitimate government interests of protecting the welfare of particularly vulnerable consumers and limiting or minimizing the manipulation of funds required to be held in trust by funeral directors and cemetery operators.

*By the Court.*—The decision of the court of appeals is affirmed.

---

[15] Because we conclude that the anti-combination laws are constitutional as a matter of law, we need not decide whether Porter has raised an issue warranting a trial.   We do, however, highlight a passage from the court of appeals opinion:

> We decline Porter's invitation to remand this case for further proceedings, as none are necessary. . . . In addition to being unprecedented, allowing for a fact-finding hearing would improperly elevate a so-called factual determination——presumably one made under a mere preponderance-of-the-evidence standard——as dispositive of the question of the anti-combination laws' constitutionality——which determination we know involves a more stringent standard that is a question of law.

Porter, 378 Wis. 2d 117, ¶48.

¶52 REBECCA GRASSL BRADLEY, J. and DANIEL KELLY, J., *(dissenting).* The people of Wisconsin vest distinct constitutional powers of governance in each branch of government, but consistent with founding principles of limited government and individual freedom, the people also impose constraints on the exercise of those powers. The Wisconsin Constitution begins with a Declaration of Rights, echoing language from our nation's Declaration of Independence, recognizing that the proper role of government——the very reason governments are instituted——is to secure our inherent rights, including liberty:

> All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed.

Wis. Const. art. I, § 1 (emphasis added). "Too much dignity cannot well be given to that declaration." State v. Redmon, 134 Wis. 89, 101, 114 N.W. 137 (1907). An inherent right to liberty means all people are born with it; the government does not bestow it upon us and it may not infringe it. Our nation's founders dissolved "all Allegiance to the British Crown" in order to restore liberty to the people.[1] "Give me liberty or give me death," Patrick Henry's impassioned plea during those revolutionary times, embodies the fundamental importance of

---

[1] The Declaration of Independence para. 32 (U.S. 1776).

liberty, our "[f]reedom from arbitrary, despotic, or autocratic control."[2]

¶53 While the people empower the legislature to enact laws and make policy, the constitution compels the judiciary to protect the liberty of the individual from intrusion by the majority. "[C]ourts of justice are to be considered as bulwarks of a limited Constitution against legislative encroachments . . . ." The Federalist No. 78, at 469 (Alexander Hamilton) (Clinton Rossiter ed., 1961). Consistent with that duty, courts must earnestly scrutinize laws that are challenged for infringing constitutional rights.

¶54 Because government exists to protect and safeguard liberty, the legislature may restrict it only for a legitimate government purpose. Applying even the most deferential review of the laws challenged in this case, we discern no legitimate government interest underlying the anti-combination statutes. We would reverse the court of appeals and declare the anti-combination laws unconstitutional. We respectfully dissent.

I

¶55 Mr. Porter argues that Wis. Stat. §§ 157.067(2)[3] and 445.12(6),[4] commonly referred to as the anti-combination laws,

---

[2] Liberty, Oxford English Dictionary (3d ed. 2010).

[3] Wisconsin Stat. § 157.067(2) provides:

No cemetery authority may permit a funeral establishment to be located in the cemetery. No cemetery authority may have or permit an employee or agent of the cemetery to have any ownership, operation or other financial interest in a funeral establishment. Except as provided in sub. (2m), no

(continued)

are unconstitutional under Article I, Section 1 of the Wisconsin Constitution because those laws deny him his fundamental right to economic liberty——here, the right to earn a living in the lawful occupation of his choice. The challenged laws prohibit contemporaneous ownership or operation of both a funeral home and a cemetery. Mr. Porter owns and operates Highland Memorial Park Cemetery and would like to operate a funeral home in addition, but the anti-combination statutes prohibit him from doing so. He asserts that these laws were passed at the behest of the funeral directors seeking to limit competition from cemetery owners. Indeed, funeral directors drafted the original statutory language and submitted it to the legislature on Wisconsin Funeral Directors and Embalmers Association

---

cemetery authority or employee or agent of a cemetery may, directly or indirectly, receive or accept any commission, fee, remuneration or benefit of any kind from a funeral establishment or from an owner, employee or agent of a funeral establishment.

[4] Wisconsin Stat. § 445.12(6) provides:

No licensed funeral director or operator of a funeral establishment may operate a mortuary or funeral establishment that is located in a cemetery or that is financially, through an ownership or operation interest or otherwise, connected with a cemetery. No licensed funeral director or his or her employee may, directly or indirectly, receive or accept any commission, fee, remuneration or benefit of any kind from any cemetery, mausoleum or crematory or from any owner, employee or agent thereof in connection with the sale or transfer of any cemetery lot, outer burial container, burial privilege or cremation, nor act, directly or indirectly, as a broker or jobber of any cemetery property or interest therein.

3

letterhead. The law went into effect in 1939, and was amended in 1943, as a "measure requested and sponsored by the Wisconsin Funeral Directors and Embalmers Association." <u>See</u> Drafting File, 1939 WI Act 240, p.2, Legislative Reference Bureau, Madison, Wis.[5] Mr. Porter believes there is no legitimate governmental interest supporting the anti-combination laws, and he submitted evidence demonstrating that the 39 states without these laws experience no monopolistic or price-fixing behavior in the industry. Mr. Porter contends favoritism toward funeral directors at the expense of cemetery owners motivated the legislature to enact these protectionist laws.

¶56 The State argues the statutes protect against funeral industry monopolies, which would stifle competition, violate anti-trust laws, and ultimately result in higher prices for grieving customers. The State points to eight other states that enacted prophylactic statutes discouraging or forbidding joint operation of funeral homes and cemeteries as evidence of the need for Wisconsin's anti-combination statutes. It notes the heavy consumer protection regulations in the death industry due to the vulnerability of individuals who must make important financial decisions within hours of the loss of a loved one. The State's position is that these laws are rationally related to the following legitimate government interests: (1) protecting consumers from higher prices and (2) reducing the

---

[5] Wisconsin's anti-combination laws have been revised and rewritten over the years and now appear in Wis. Stat. §§ 157.067(2) and 445.12(6).

potential for evasion of Wisconsin's death care trusting requirements.

¶57 Mr. Porter's constitutional challenge is a facial one; he asserts the statute is unconstitutional in every circumstance. See State v. Smith, 2010 WI 16, ¶10 n.9, 323 Wis. 2d 377, 780 N.W.2d 90 (discussing difference between facial and as-applied constitutional challenges). The burden to prove a statute unconstitutional rests with the party challenging it. This court describes that burden as a "heavy" one because the court presumes the legislation is constitutional, engages in every attempt to uphold the statute, and requires a party challenging a law to prove it "is unconstitutional beyond a reasonable doubt." Id., ¶8; see also, Borgnis v. Falk Co., 147 Wis. 327, 348, 133 N.W. 209 (1911) ("In approaching the consideration of the present law, we must bear in mind the well-established principle that it must be sustained, unless it be clear beyond reasonable question that it violates some constitutional limitation or prohibition."). This is the law and we are bound to apply it. But see Mayo v. Wis. Injured Patients & Families Comp. Fund, 2018 WI 78, ¶___, ___ Wis. 2d ___, ___ N.W.2d ____ (R. Grassl Bradley, J., concurring) (questioning whether beyond a reasonable doubt is an appropriate burden to impose on a person challenging the constitutionality of a statute).

II

¶58 Before assessing whether the anti-combination statutes violate the Wisconsin Constitution, it is necessary to decide

what level of judicial review applies: (1) rational basis; (2) rational basis "with teeth"; or (3) strict scrutiny. The State advocates for the basic rational basis test while Mr. Porter requests rational basis "with teeth" review, couching it as the "real and substantial" standard historically applied to strike down protectionist laws in Wisconsin lacking a real and substantial link to some legitimate governmental purpose. This court, however, overruled the supreme court case that created the rational basis with teeth standard, thereby eliminating this level of review. See id., ¶38 (majority opinion) (overruling Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440). Only two options for judicial review of challenged legislation remain: (1) the traditional rational basis test or (2) the strict scrutiny standard.

A

¶59 The level of judicial scrutiny depends upon the nature of the challenged legislation. State v. Alger, 2015 WI 3, ¶39, 360 Wis. 2d 193, 858 N.W.2d 346. When the statute implicates a fundamental right or discriminates against a suspect class, this court applies strict scrutiny and the law will be upheld "only if narrowly tailored 'to serve a compelling state interest.'" Id. (quoting Milwaukee Cty. v. Mary F.-R., 2013 WI 92, ¶35, 351

Wis. 2d 273, 839 N.W.2d 581).[6]  In all other challenges, we review the law under the rational basis test and uphold it "unless it is 'patently arbitrary' and bears no rational relationship to a legitimate government interest." Id. (quoting Smith, 323 Wis. 2d 377, ¶12).

¶60 No one argues the challenged statutes discriminate against a suspect class, but Mr. Porter does assert the statute implicates a fundamental right——liberty.  Wisconsin case law defines "fundamental rights" as "those which are either explicitly or implicitly based in the Constitution." State v. Martin, 191 Wis. 2d 646, 651-52, 530 N.W.2d 420 (Ct. App. 1995). This court reaffirmed that definition in Vincent v. Voight, 2000 WI 93, ¶80, 236 Wis. 2d 588, 614 N.W.2d 388 ("Fundamental rights are based on the Constitution either explicitly or implicitly." (citing Martin, 191 Wis. 2d at 652)).

B

¶61 The Wisconsin Constitution explicitly identifies liberty as an inherent right and establishes state government for the express purpose of securing liberty, among other rights. The question then becomes whether economic liberty falls within liberty's protection.  The Wisconsin Constitution does not define liberty, but the framers of our state constitution

---

[6] Whether strict scrutiny or rational basis applies to a statute involving a fundamental right may also depend on the extent the law burdens the right. See State v. Alger, 2015 WI 3, ¶39 n.16, 360 Wis. 2d 193, 858 N.W.2d 346.  A severe restriction compels strict scrutiny review but a reasonable restriction, which does not cause significant restriction, may trigger rational basis review. Id.

7

expressly incorporated language from the Declaration of Independence, including liberty among those inherent rights governments are instituted to protect. Therefore, we may ascertain the original public meaning of liberty by considering the documented perspective of our nation's founders, in particular the principal author of the Declaration of Independence, Thomas Jefferson.

¶62 Thomas Jefferson's understanding of "liberty" was influenced by the writings of Enlightenment thinkers and Whig intellectuals.[7] At the time of Independence, the concept of "liberty" was "quite broad, encompassing economic liberty as well as other forms of liberty less tangible than mere freedom from physical restraint."[8] Cato's Letters, from which Jefferson and other Framers conceptualized economic and political doctrine, defined "liberty" as follows:

> [T]he Right of every Man to pursue the natural, reasonable, and religious Dictates of his own Mind; to think what he will, and act as he thinks, provided not to the Prejudice of another; to spend his own Money himself, and lay out the Produce of his Labour his own Way; and to labour for his own Pleasure and Profit, and not for others who are idle, and would live and riot by pillaging and oppressing him, and those that are like him.[9]

---

[7] David N. Meyer, Liberty of Contract: Rediscovering a Lost Constitutional Right 14 (2011).

[8] Id.

[9] Id. at 15 (quoting "Cato," An Enquiry into the Nature and Extent of Liberty (Letter No. 62) (Jan. 20, 1721), in John Trenchard & Thomas Gordon, 2 Cato's Letters: Or, Essays on Liberty, Civil and Religious, and Other Important Subjects 244-45, 248 (1733).

Cato's Letters, a major influence upon Jefferson, envisioned "liberty" to encompass economic freedom and the right of individuals to choose the means and manner of their labor, free from restraint.

¶63 Jean Jacques Burlamaqui, a Swiss jurist, heavily influenced the Framers' language in the Declaration of Independence.[10] Burlamaqui regarded liberty as a natural right of individuals "[to] dispos[e] of their persons and property, after the manner they judge most convenient to their happiness." With Jefferson grounding his philosophy in Burlamaqui and Cato's Letters, the concept of "liberty" that formed the basis for Independence naturally encompasses economic freedom.[11]

¶64 James Madison regarded a government that would infringe individual economic liberty as unjust: "That is not a just government, nor is property secure under it, where arbitrary restrictions, exemptions, and monopolies deny to part of its citizens that free use of their faculties, and free choice of their occupations . . . ."[12] Just as our nation's founders recognized the importance of economic freedom, over a century ago this court adopted an expansive interpretation of

---

[10] Id. at 14.

[11] See id. at 14-17 (arguing that Jefferson, as well as most other Framers, understood "liberty" and the "Pursuit of Happiness" as broad concepts based on Cato's Letters and Burlamaqui).

[12] James Madison, Property, Nat'l Gazette, Mar. 29, 1792, reprinted in The Founder's Constitution 598 (Philip B. Kurland & Ralph Lerner eds., 1987).

liberty. The term "liberty" in our constitution "does not mean merely immunity from imprisonment,"

> [but] include[s] the opportunity to do those things which are ordinarily done by free men, and the right of each individual to regulate his own affairs, so far as consistent with rights of others.

State ex rel. Zillmer v. Kreutzberg, 114 Wis. 530, 533-34, 90 N.W. 1098 (1902). Early in Wisconsin history, this court repeatedly and consistently recognized economic liberty——the right to earn a living in any lawful occupation without unnecessary government interference——as a fundamental, constitutional right.[13]

¶65 In Maxwell v. Reed, 7 Wis. 493 (*582), 499 (*594) (1859), this court recognized the right to earn a living as "one of the great bulwarks of individual freedom" "guarded by . . . fundamental law." The Maxwell court emphasized the need to protect and preserve the right every citizen has to attain "the means of living." Id. at 498 (*594). In Taylor v. State, 35 Wis. 298, 301 (1874), this court declared location restriction laws imposed on businesses posing no danger to the public to be invalid and "an unjustifiable restriction upon, and interference with, the fundamental rights of the citizen." In

---

[13] Economic liberty is also rooted in our nation's history. See Patel v. Tex. Dep't of Licensing & Regulation, 469 S.W.3d 69, 93 (Tex. 2015) (Willett, J., concurring) ("The U.S. Supreme Court has repeatedly declared that the right to pursue a lawful calling 'free from unreasonable governmental interference' is guaranteed under the federal Constitution, and is 'objectively, deeply rooted in this Nation's history and tradition.'" (footnotes omitted)).

10

State ex rel. Winkler v. Benzenberg, 101 Wis. 172, 176, 76 N.W. 345 (1898), this court noted that unreasonable laws "interfer[ing] with the right of the citizen to pursue his calling," which "invade the right of the citizen to pursue a lawful business" cannot be upheld. This court has long acknowledged that laws unreasonably interfering with "the right of the citizen to pursue his calling" run afoul of the constitution. Id. at 176-78 (voiding a law as unconstitutionally discriminating against solo plumbers by granting "special privileges" to plumbers in partnership).

¶66 This court's protection of economic liberty continued into the 20th century, when the court held that "[t]he general right of every person to pursue any calling, and to do so in his own way, provided that he does not encroach upon the rights of others, cannot be taken away from him by legislative enactment." Kreutzberg, 114 Wis. at 534 (emphasis added) (quoted source omitted). The court later identified an employer's constitutional right to employ whom he will, see, e.g., A.J. Monday Co. v. Auto., Aircraft & Vehicle Workers of America, Local No. 25, 171 Wis. 532, 539-541, 177 N.W. 867 (1920) ("The right of an employer to exercise his constitutional privilege as to whom he will employ has been fully established in this state." (citing Kreutzberg, 114 Wis. at 534)); and upheld a citizen's constitutional right to carry on a lawful business, see, e.g., McGraw-Edison Co. v. Sewerage Comm'n of Milwaukee, 11 Wis. 2d 46, 53, 104 N.W.2d 161 (1960) ("Prohibition of the use

11

of a suitable and legitimate product certainly interferes with plaintiffs' right to carry on a lawful business.").

¶67 In several cases, this court specifically recognized the limits on legislative power to confer economic prerogatives on certain groups to the exclusion of others. For example, the court declared unconstitutional a law banning the sale of oleomargarine, which was passed to protect the dairy industry from competition posed by makers of butter substitutes. John F. Jelke Co. v. Emery, 193 Wis. 311, 321-22, 214 N.W. 369 (1927). Criticizing the legislature for violating its constitutional duty to protect personal liberty, the John F. Jelke court noted: "The constitution is the mandate of a sovereign people to its servants and representatives, and no one of them has a right to ignore or disregard its plain commands." Id. at 321. The John F. Jelke court also emphasized limits on legislative power when its exercise touches constitutional rights, as well as the judicial duty to employ a more exacting scrutiny of legislation that oppresses the people:

> [F]rom the standpoint of constitutional right the Legislature has no more power to prohibit the manufacture and sale of oleomargarine in aid of the dairy industry than it would have to prohibit the raising of sheep in aid of the beef cattle industry, or to prohibit the manufacture and sale of cement for the benefit of the lumber industry. In some cases a proper exercise of the police power results in advantage to a particular class of citizens and to the disadvantage of others. When that is the principal purpose of the measure, courts will look behind even the declared intent of Legislatures, and relieve citizens against oppressive acts, where the primary purpose is not to the protection of the public health, safety, or morals.

12

Id. at 323 (emphasis added).

¶68 In Dairy Queen of Wis., Inc. v. McDowell, 260 Wis. 471, 478c, 51 N.W.2d 34 (1952), reh'g denied, 260 Wis. 471, 52 N.W.2d 791, Dairy Queen challenged a ban on its lower fat ice-cream-like product in Wisconsin. Organizations associated with the dairy industry filed amicus briefs, which the court construed as "promot[ing] a restricted market" for that industry. Id. The Dairy Queen court rejected the notion "that the legislature or the court should be party to an act which appears to have no purpose except to protect the interests of the . . . manufacturers of ice cream . . . against the competition of Dairy Queen." Id. at 478b-78c. Instead, the court applied John F. Jelke in holding the statute invalid.

¶69 In State ex rel. Grand Bazaar Liquors, Inc. v. City of Milwaukee, 105 Wis. 2d 203, 313 N.W.2d 805 (1982), this court declared unconstitutional a Milwaukee ordinance that granted liquor licenses only if the licensee's business received at least 50 percent of its income from the sale of intoxicants. Id. at 204-06. The ordinance had an anti-competitive purpose "to keep large retail stores out of the retail liquor business." Id. at 209-10. The court, applying the rational basis test, cautioned that "we should not blindly rubber stamp legislation enacted under the guise of the city's police power when careful review has revealed no logical link between the legislation and the objective it was enacted to effect." Id. at 218. Accordingly, the court determined that the ordinance did "not accomplish the articulated goals" and was "an arbitrary and

13

irrational exercise of the city's police power and a denial of equal protection." Id. at 212.

¶70 Permeating these decisions is the notion of individual freedom, which may not be subjugated by majoritarian impulses or the success of certain interest groups in prevailing upon legislators for special privileges at the expense of individual rights: "Free will in making private contracts, and even in greater degree in refusing to make them, is one of the most important and sacred of the individual rights intended to be protected." Kreutzberg, 114 Wis. at 540.

¶71 Courts and legal commentators increasingly recognize the importance of an engaged judiciary in protecting economic liberty, and modern courts are abandoning the reflexive rubber-stamping of legislative acts that infringe it. See, e.g., Patel v. Tex. Dep't of Licensing & Regulation, 469 S.W.3d 69 (Tex. 2015) (Willett, J. concurring) (discussing economic liberty as fundamental right under state constitution); Randy E. Barnett, Does the Constitution Protect Economic Liberty?, 35 Harv. J.L. & Pub. Pol'y 5 (2012) (concluding the Constitution protects economic liberty as a fundamental right that may be reasonably regulated but not infringed); see also Saint Joseph Abbey v. Castille, 712 F.3d 215, 226-27 (5th Cir. 2013) (striking down anticompetitive law restricting the sale of funeral merchandise to state-licensed funeral directors in challenge by Benedictine monks wanting to sell handcrafted pine coffins); Merrifield v. Lockyer, 547 F.3d 978, 991-92 n.15 (9th Cir. 2008); Craigmiles v. Giles, 312 F.3d 220, 222, 224 (6th Cir. 2002) (invalidating

14

state law banning sale of caskets by anyone other than funeral directors as infringement of economic liberty and concluding that "protecting a discrete interest group from economic competition is not a legitimate governmental purpose"); Casket Royale, Inc. v. Mississippi, 124 F. Supp. 2d 434, 436-37 (S.D. Miss. 2000); Santos v. City of Houston, 852 F. Supp. 601, 607-08 (S.D. Tex. 1994) ("[A] statute based on pure favoritism which creates a closed class will likely be declared unconstitutional."); Shoul v. Commonwealth, 173 A.3d 669, 677 (Pa. 2017) (quoting Gambone v. Commonwealth, 101 A.2d 634, 636-37 (Pa. 1954) for the proposition, "Under the guise of protecting the public interests, the legislature may not arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations."); David E. Bernstein, The Due Process Right To Pursue a Lawful Occupation: A Brighter Future Ahead?, 126 Yale L.J.F. 287 (Dec. 5, 2016). Regardless of the standard of review employed, the court in this case overlooked an opportunity to thoroughly scrutinize legislation that advances the economic interests of one group over the liberty interests of another at the level of inquiry it deserves.

## III

### A

¶72 Economic liberty——the right to pursue a lawful occupation or business endeavor——predates the establishment of Wisconsin statehood, as well as our nation's founding. "[A]t the Common Law no man might be forbidden to work in any lawful

15

Trade . . . ." The Case of the Tailors of Habits &c. of Ipswich (1614) 12 James I (KB), reprinted in 1 The Selected Writings of Sir Edward Coke 392 (Steve Sheppard ed., 2003). As Blackstone noted, "[a]t common law every man might use what trade he pleased."[14]

¶73 Historically, Wisconsin courts rejected laws grounded solely in economic protectionism. In doing so, as Wisconsin case law illustrates, this court demonstrated its longstanding commitment to protecting the people's constitutional liberty interest, enshrined in Article I, Section 1, of the Wisconsin Constitution as an inherent and fundamental right.

¶74 Because Article I, Section 1 of the Wisconsin Constitution includes economic liberty within its general guarantee of liberty as an inherent and fundamental right, we question whether rational basis review is the appropriate standard to apply in assessing the constitutionality of the anti-combination statutes in this case. When fundamental constitutional rights are implicated, we generally apply strict scrutiny review. The anti-combination statutes completely prohibit funeral homes and cemeteries from combining operations, thereby flatly forbidding Mr. Porter to "do those things which are ordinarily done by free men" and infringing "the right of each individual to regulate his own affairs." See Kreutzberg, 114 Wis. at 534. Specifically, the statutes deny Mr. Porter his inherent right to earn a living in the lawful occupation of his

---

[14] 2 William Blackstone, Commentaries *427.

choice by precluding him from providing funeral home services solely because he already operates a cemetery. Because the statutes infringe a fundamental right and the burden imposed upon the right is a severe restriction, strict scrutiny review would seem to be appropriate. See Alger, 360 Wis. 2d 193, ¶39 n.16.

¶75 The parties here, however, did not brief or argue application of strict scrutiny to the asserted infringement of economic liberty under the declaration of inherent rights in Article I, Section 1; therefore, we leave that analysis for another case. Instead, we address the issues presented by the parties: whether the anti-combination statutes violate the constitutional guarantee of equal protection, and under the rational basis test, do the anti-combination statutes bear a relationship with any legitimate government interest?

B

¶76 As applicable to Mr. Porter, the effect of the anti-combination laws is to create a class of people who may not have a financial interest in funeral establishments. That class consists exclusively of cemetery associations' employees and agents. Wis. Stat. § 157.067(2). As for Highland Memorial, the laws create a class of organizations that may not host funeral establishments on their property. That class consists

17

exclusively of cemetery associations.[15] Mr. Porter and Highland Memorial say these classifications, and the attendant differential treatment, violate their equal protection rights. We agree.

¶77 The United States Constitution promises Mr. Porter and Highland Memorial the equal protection of the laws. See U.S. Const. amend. XIV, § 1 ("No state shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."). So does Wisconsin's Constitution. See Wis. Const. art. 1, § 1 ("All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."). When a law divides people into classes, it creates the potential for differential treatment under the law. That is why, when we encounter such classes, our first question is whether the law treats them differently. Aicher ex rel. LaBarge v. Wis. Patients Comp. Fund, 2000 WI 98, ¶56, 237 Wis. 2d 99, 613 N.W.2d 849 ("Parties

---

[15] Because the anti-combination laws are interlocking as between cemetery associations and funeral establishments, the law also creates a class of people who may not have a financial interest in cemetery associations, or locate their businesses on cemetery grounds. That class comprises funeral directors and operators. Wis. Stat. § 445.12(6). We could conduct the equal protection analysis from the perspective of either (a) funeral directors and operators, or (b) cemetery association employees and agents. Because the petitioners fall into the latter category, we will address their perspective.

18

seeking to challenge the constitutional[ity] of a statute on equal protection grounds must demonstrate that the statute treats members of a similarly situated class differently."). If so, we then evaluate the legitimacy of the law's purpose, and whether there is an acceptable fit between the purpose and the means by which the law attempts to achieve it. See, e.g., State v. West, 2011 WI 83, ¶90, 336 Wis. 2d 578, 800 N.W.2d 929 ("The right to equal protection does not require that such similarly situated classes be treated identically, but rather requires that the distinction made in treatment have some relevance to the purpose for which classification of the classes is made."). When the classification does not affect a fundamental right, we review the "fitness" aspect under the rational basis standard of scrutiny. Castellani v. Bailey, 218 Wis. 2d 245, 264, 578 N.W.2d 166 (1998) ("Where . . . a suspect classification is not alleged, and fundamental constitutional rights are not at stake, the statute must be sustained unless it is patently arbitrary and bears no rational relationship to a legitimate government interest." (internal quotations and citation omitted)). For purposes of this section of our opinion, we assume the anti-combination laws do not touch on a fundamental right. Therefore, we will conclude the "legislative classification satisfies the rational basis test if it meets five criteria":

(1) All classification[s] must be based upon substantial distinctions which make one class really different from another.

(2) The classification adopted must be germane to the purpose of the law.

19

(3) The classification must not be based upon existing circumstances only. [It must not be so constituted as to preclude addition to the numbers included within a class].

(4) To whatever class a law may apply, it must apply equally to each member thereof.

(5) That the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

Aicher, 237 Wis. 2d 99, ¶58 (brackets in original).

¶78 The second and fifth elements of this test, which lie at the heart of this contest, are best evaluated together. Combined, they instruct us to consider whether the law's classification is germane to its purpose, and reasonably suggests the propriety of imposing on the different classes substantially different rights or disabilities. The State proffers two explanations in satisfaction of these requirements. First, it says, the anti-combination laws "reasonably restrict anti-competitive commercial activity through prophylactic antitrust-like rules forbidding the formation of potentially monopolistic firms." And second, it says "the anti-combination laws are also rationally related to the State's interest in limiting the manipulation of funds required to be held in trust."

### 1. Anti-Competitiveness

¶79 The State's first justification for the anti-combination laws rests on what might be the firmest possible grounds. Protecting consumers from monopolistic practices is an

20

exercise of the state's police powers.[16]  And when the State exercises its police powers, it is operating in an arena where it has maximum flexibility to craft and implement its policies.[17] But the arena, like all arenas, has boundaries.  It is our responsibility to point them out and adjudge whether the State's chosen policy has fallen out of bounds.  And even though we presume the policies fall on the lee side of the line, our rational basis scrutiny is neither feckless nor lackadaisical. We insist that there really be a rational, non-fanciful connection between the law's purpose and the means by which the law pursues that purpose.  The guiding principle of this type of scrutiny is bound up in its name——"rational basis."  Something is rational only if there are reasons that support it.  Reasons

---

[16] See, e.g., Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc., 190 Wis. 2d 650, 662, 529 N.W.2d 905 (1995) ("Antitrust laws are intended to prevent restraints on free competition, restraints which can harm purchasers, consumers of goods and the public. The importance of the antitrust laws in preventing monopolies and encouraging competition, 'the fundamental economic policy of this state,' is directly reflected in the statement of legislative intent in sec. 133.01, Stats. 1991-92, and in the case law.").

[17] See Kahn v. McCormack, 99 Wis. 2d 382, 384, 299 N.W.2d 279 (Ct. App. 1980) ("The state's police power has been defined as 'the inherent power of government to promote the general welfare.'  This power is broad, and includes the right to regulate the use of property and the conduct of business." (quoted source and internal citation omitted)); see also Bisenius v. Karns, 42 Wis. 2d 42, 54, 165 N.W.2d 377 (1969) ("[O]nce within the area of proper exercise of police power, it is for the legislature to determine what regulations, restraints or prohibitions are reasonably required to protect the public safety and only the abrogation of a basic and substantial individual liberty would justify judicial intervention to set aside the legislative enactments.").

require logic, and logic is communicable from one person to another. So the anti-combination laws survive rational basis scrutiny only if the State can provide to us a logical explanation for how they accomplish their legitimate purpose.

¶80 The State's argument requires us to unpack some economic theory before we can determine whether there is a logical connection between the anti-combination laws and the monopoly-averting objective they are to achieve. The State's concern lies with what it believes might occur if cemeteries and funeral establishments were allowed to combine into one company. It fears that such an integrated company would consolidate so much market share that the resulting control of the field would allow it to charge higher prices for its goods and services than would be possible absent the integration. The general concept is sound, and courts have regularly affirmed that legislatures may adopt laws protecting against that danger. See, e.g., Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc., 190 Wis. 2d 650, 662, 529 N.W.2d 905 (1995) . And the State need not wait until the injury comes to pass before acting; legislatures properly deploy anti-combination laws prospectively to prevent the monopolistic seeds from taking root. See, e.g., Paramount Pictures, Inc. v. Langer, 23 F. Supp. 890, 900 (D. N.D. 1938) (per curiam) (acknowledging that a state legislature, in exercising its police power, may enact laws "'to prevent a practice conceived to be promotive of monopoly with its attendant evils'" and stating the court's opinion "that the existence of unusual power to deal with competitors

22

unfairly . . . is probably a sufficient basis for legislative action to prevent the possibility of its exercise." (citation omitted)); see also May's Drug Stores v. State Tax Comm'n, 45 N.W.2d 245, 247 (Iowa 1950) (stating that in considering the validity of various legislation addressing fair trade, unfair discrimination, and unfair competition, "the courts always recognized that the promotion of free competition was a proper legislative endeavor under the police power.").

¶81 Because all of that spadework has already been accomplished, we can narrow our work to a fine point. We need only explore whether there is something about cemeteries and funeral establishments that gives rise to a monopolistic dynamic if they are allowed to integrate. If there is, then we must conclude there is a rational basis for the anti-combination laws. If there is not, then we will have to move on to the State's second justification for these laws.

¶82 Anti-competitive behavior can present in any number of different forms. The one immediately of concern here is the "foreclosure" effect that can follow from the "vertical integration" of two or more companies. Although the jargon is technical, what it describes is not especially complicated. "Vertical integration," the State explained, "occurs when a company merges with another company that provides a necessary input in the product supply chain." It says higher prices may result from such a combination, "specifically when a company combines with a firm that provides a scarce resource and when other would-be sellers of that scarce resource face high

23

barriers to entry." The foreclosure effect occurs when the integrated firm uses its control of the scarce resource to give itself a price advantage in the marketplace that it can pass along to its customers. It accomplishes this by making the scarce resource more expensive to its competitors, either by controlling so much of the market that competition for the remaining resources causes a supply-demand upward spiral, or by selling the scarce resource to competitors at an inflated price, or by denying its competitors access to the resource altogether. As the State explained, "a combined firm——one with access to the resource through ownership——can charge its consumers a lower price for the resource and charge rival firms a higher price, thus gaining market share."

¶83 There is nothing inherently wrong, of course, with one company obtaining more market share than its competitors. The problem, if there is to be a problem, comes later. An integrated firm with control of a scarce resource can use that control to underwrite lower prices for its own customers while inflating the cost of its competitors' products. Eventually, with that price advantage, the integrated firm could not only obtain greater market share, but also drive its competitors from the market. Finding itself alone, or virtually alone, in its product category, the State says, the integrated firm will do an about-face and "charge all consumers higher prices." There is a real danger that the remaining player on the field can thereafter maintain its dominant (or even exclusive) position because its control of the scarce resource makes it either too

expensive for potential competitors to re-enter the field, or entirely impossible. The validity of this theoretical construct is accepted broadly enough that it has generated no dispute between the parties here.

¶84 As we now consider how this theory applies to cemeteries and funeral establishments, remember that vertical integration is about obtaining a company that has a resource necessary to production of the integrated firm's goods or services; the key to understanding the theory (and the analysis below) is keeping a watchful eye on where that resource appears in the supply chain. If the scarce resource is to empower the company to produce a maleficent effect, its place in the supply chain must precede the ultimate product. The importance of that resource's place in the supply chain is the power it gives the company to make its final product more competitive through the foreclosure effect. But if the ultimate product is itself the scarce resource, then vertical integration has added nothing to the company's power to exert economic pressure on its competitors.

¶85 The State says the scarce resource in this calculation is burial plots: "[C]emeteries provide a relatively scarce good (burial plots), and it is difficult for would-be cemetery operators to break into this market." Its expert also agreed that the burial plots are the scarce resource, particularly when compared to funeral homes: "As economist Dr. Sundberg explained, '[g]iven the land, capital, and regulatory requirements, it is reasonable to believe that entering the

cemetery industry is much more difficult than starting a new funeral home.'" (Alteration in original.) Therefore, the State says, integrated cemetery/funeral homes are problematic because, "having access to the scarce resource of burial plots, [the integrated firm] would be well positioned to use its market share to set inflated burial-plot prices for consumers coming through competitors' standalone funeral homes while charging its own consumers reduced prices." (Alteration in original.) The State goes on to say that "[t]he small number of cemeteries and the barriers to creating new ones, especially in urban areas, give a special advantage to well-capitalized large firms that can afford to purchase multiple funeral homes. With enough funeral homes, it may be profitable for a cemetery to completely exclude burials from funeral homes owned by others."

¶86 Notice the direction of economic movement through the supply chain. The customer goes through the funeral home to the cemetery. The scarce resource (the burial plot) already belongs to the cemetery before it vertically integrates. Vertical integration theory, however, teaches us to look for the scarce resource in the part of the supply chain the cemetery does not already own. So when the State looks in the proper spot, all it sees is funeral homes, which it admits (as does its expert) is not the scarce resource. Therefore, vertically integrating with a funeral home will not empower the cemetery to foreclose its competitors, or make itself into a price-gouging monopoly. The thing the State fears cannot be accomplished through the mechanism of vertical integration. Here's why.

26

¶87 Imagine that Highland Memorial and Mr. Porter vertically-integrated with a funeral home; if this gives it the power to turn itself into a monopoly, we should be able to watch it happen in our mind's eye as the theory described by the State comes to life and governs Highland Memorial's economic progress in the market. But as we will see, if Highland Memorial attempted the foreclosure gambit, it would undoubtedly be disappointed by the results. Lowering the cost of burial plots for those who use its funeral home services and raising it for others is not likely to bring it additional market share. This price reduction must be accounted for somewhere. There are three possibilities: (1) Highland Memorial absorbs the loss as a short-term hit in an attempt to gain market share, after which it raises prices back to an economically-viable level (or higher if it captures enough market share); (2) Highland Memorial raises the cost of its funeral home services to make up the difference; or (3) the profits from its funeral home operations subsidize its cemetery operations to such an extent that Highland Memorial can operate profitably even with the reduced rates on burial plots. If the first option describes Highland Memorial's operations, it will be able to put economic pressure on competing cemeteries——but its ability to do so has nothing to do with the funeral home; it could have done the same thing without integrating. If the second option is the operative scenario, then Highland Memorial can put no economic pressure on competing cemeteries at all because the combined cost for cemetery plots and funeral home services does not change.

27

Option three presents the most likely scenario in which Highland Memorial may make a sustainable bid for market share because the combined operations allow it to offer a cumulative price to its customers that stand-alone cemeteries and funeral homes cannot match.

¶88 But not even option three gives Highland Memorial the power to foreclose its competitors. The key, as mentioned above, is the position of the scarce resource in the supply chain. A cemetery competing with Highland Memorial has no need to acquire such a resource to remain competitive. It is the scarce resource. The only thing it needs to remain on par with Highland Memorial is the addition of funeral home services. And as the State and its expert admitted, those are not scarce. Once the competing cemetery obtains its own funeral home, it's back to parity with Highland Memorial, and neither has any inborn advantage as they compete for market share.

¶89 But let's assume Highland Memorial is a very well-capitalized cemetery (a scenario the State posits as particularly dangerous), and it uses its reserves to snap up one funeral home after another until it believes it can direct all funeral traffic to itself. Here, the State's concession that funeral homes are not scarce is especially important, and explains why Highland Memorial can gain no advantage. Highland Memorial could burn through the most generous stack of cash and never acquire a controlling interest in the funeral home market. That supply is theoretically unlimited, and if Highland Memorial made an attempt to corner the market, it would find itself

28

paying parlors full of funeral directors with not enough work to keep them busy. Meanwhile, the competing cemetery would simply send an employee through the funeral-director licensing process, after which its overhead would be substantially lower than the funeral-director heavy Highland Memorial. The free market's creative destruction would have its way with Highland Memorial, after which the competitor, not Highland Memorial, would be left standing.

¶90 The only way vertical integration could create the type of danger the State fears is an exact reversal of the State's well-capitalized cemetery scenario. In this hypothetical, the cemeteries and funeral homes switch places, and it is the well-capitalized funeral home that goes on a spending spree. Here, the funeral home would use its resources to acquire a large number of cemeteries, such that anyone wishing to be buried must use its services. That would at least position the scarce resource (the burial plots) in the supply chain where it could give the well-capitalized funeral home the power to foreclose its competitors. The State likely did not advance this alternative scenario because there is nothing for the anti-combination laws to do under such circumstances. Vertical integration cannot create a funeral-home monopoly without preliminarily creating another monopoly——a monopoly in cemeteries. So the aspiring proprietor of a funeral-home monopoly will find himself stymied by the statutes that have as their purpose the prevention of that harmful preliminary monopoly. See Wis. Stat. ch. 133 (Trusts and Monopolies).

29

Without the ability to form the cemetery monopoly, vertical integration will do nothing to advance his plans for a funeral home monopoly. Consequently, the anti-combination laws have nothing to do with the prevention of anti-competitive behavior under these circumstances.

¶91 It is not a trifling thing when our laws prevent some of Wisconsin's citizens, but not others, from engaging in lawful economic activity. There must be an acceptable reason for doing so, and it must be expressible in logical terms. The court, in deciding there is such a reason, provided no analysis. It instead chose to simply paraphrase the State's expert:

> As to the State's first articulated interest (i.e., protecting consumers), [the State's expert] opined that without the anti-combination laws, combination firms would, in the short run, offer lower prices than stand-alone funeral homes and limit stand-alone firms' access to cemeteries. This would drive stand-alone funeral homes from the market at which point combination firms would increase their prices.

Majority op., ¶43. As we demonstrated, supra, the expert provided no logical connection between the anti-combination laws and the asserted interest in protecting against anti-competitive behavior. Because the court provided no independent analysis, we have no way of knowing what it believes the connection to be. The bench and bar would benefit from the court's own analysis rather than a paraphrase of the State's argument.

¶92 Our conclusion with respect to this part of the State's argument should not be understood as questioning the legislature's wisdom in enacting the anti-combination laws. We question only whether they have any rational relationship to

30

preventing anti-competitive behavior. Because they do not, we must consider the second asserted justification for their existence.

### 2. Trust Requirements

¶93 Wisconsin's statutes protect consumers who purchase death-care products and services, in part, by requiring purveyors to hold a certain amount of sale proceeds in trust. For example, a pre-death purchase of a casket requires a funeral home to hold 100 percent of the proceeds in trust until the person is deceased. Wis. Stat. § 445.125(1)(a)1. Cemeteries are required to hold 15 percent of the proceeds from the sale of burial plots in trust for perpetual care purposes. Wis. Stat. § 157.11(9g)(c). Cemetery pre-need sellers licensed under Wis. Stat. § 440.92 must hold in trust 40 percent of the proceeds of cemetery merchandise (such as monuments, markers, nameplates, vases, and urns). Wis. Stat. §§ 440.92(3)(a), 157.061(3).

¶94 The State says it can justify the anti-combination laws as a means of preventing cemeteries and funeral establishments from circumventing these trust requirements. Its cursory argument notes that if a cemetery and funeral home combine, it might charge artificially higher prices for burial plots and artificially lower prices for caskets. This would allow the combination firm to keep a smaller amount of funds in trust even as the company's revenue remains the same. The anti-combination laws prevent companies with dissimilar trust requirements from combining, the State says, as a safeguard against such accounting abuses. Therefore, it concludes, there

31

is a rational connection between the anti-combination laws' purpose and the means by which the laws accomplish that purpose.

¶95  We allow a certain amount of creative license when the State performs its post hoc rationalizations, but we need not entertain sophistry.  Not a word of the anti-combination laws suggests, even obliquely, any connection at all to the trust requirements of cemeteries and funeral homes.  And the legislature has affirmatively demonstrated it does not share the State's concern regarding the differential in trust requirements.  Cemetery associations may obtain a license under Wis. Stat. § 440.92 to serve as cemetery pre-need sellers.  Upon acquiring such a license, the cemetery must not only comply with the 15 percent trust requirement related to burial plots, it must also satisfy the 40 percent trust requirement related to cemetery merchandise.  The statutory text and framework indicate that any effect the anti-combination laws might have on compliance with the various trust requirements would be accidental and fortuitous.  Fortuity cannot stand in for a rational connection between a law's purpose and means.  In fact, it is fair to say that fortuity is the negation of a rational connection, inasmuch as logic cannot explain a chance event.  Fortifying the trust requirements imposed on cemeteries and funeral establishments is no explanation for the anti-combination laws.

*

¶96 The State has identified no rational connection between the anti-combination laws and the objectives it says

32

they are meant to achieve. But that does not mean the laws lack _any_ rational basis. We should not suppose that our legislature acts randomly, and without purpose. The State was unable to make the required logical connection because it was trying to link the anti-combination laws to a purpose they do not have. The solution to such an analytical impasse is not to develop increasingly fantastic means of relating the laws to the asserted purposes. If we want to discover the true rational basis for the anti-combination laws, we should be looking for a purpose that fits the laws like a jigsaw puzzle. Here, if we look for a fitting purpose, rather than a convoluted relationship, we instantly discover what these laws are about: trade protectionism, plain and simple. As a functional matter, there is a perfect fit between that purpose and the terms of the anti-combination laws. They protect funeral directors from facing the possibility that market forces might teach us that integrated firms are more efficient than stand-alone operations. That creates a boon to funeral directors, but a financial burden on consumers who would otherwise have access to lower-cost funeral arrangements. This basis is not enough to uphold the anti-combination laws, however, because the purpose of the law itself must be legitimate. Trade protectionism is not a legitimate purpose. See, e.g., Craigmiles, 312 F.3d at 224 ("Courts have repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose."). Therefore, because the anti-combination laws are rationally related only to an illegitimate

33

purpose, they violate the petitioners' right to the equal treatment of the laws.

IV

¶97 Because there is no rational basis connecting the anti-combination statutes to any legitimate government interest, we conclude the statutes are unconstitutional. The rational basis test applied by the court "means property is at the mercy of the pillagers."[18] Wisconsin's "constitutional guarantee of liberty deserves more respect——a lot more."[19] While generally majoritarianism rules, it may not subordinate constitutional rights to its preferences. And while the judiciary rightly defers to legislative policy choices, the judiciary should never defer to legislative trampling of individual liberty.

¶98 We respectfully dissent.

---

[18] See Hettinga v. United States, 677 F.3d 471, 483 (D.C. Cir. 2012) (Brown, J., concurring).

[19] See id.