STATE of Wisconsin, Plaintiff-Respondent,

v.

Joshua K. MARTIN, Defendant-Appellant. [Case No. 94–1643–CR.]

IN the INTEREST OF JOSHUA K.M., A Person Under the Age of 18:

STATE of Wisconsin, Petitioner-Respondent,

v.

JOSHUA K.M., Respondent-Appellant. [Case No. 94–2130.]

Court of Appeals

*Nos. 94–1643–CR, 94–2130. Submitted on briefs December 19, 1994.—Decided February 15, 1995.*

(Also recorded in 530 N.W.2d 420.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Randall E. Paulson*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney

general, and *Sally L. Wellman*, assistant attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J.   This case tests the constitutionality of Wisconsin's new statutes relating to juveniles who allegedly commit a battery while in a secured correctional facility.[1] Joshua K. Martin contends that this new statutory scheme, which presumptively waives him to the jurisdiction of our adult criminal justice system, imposes a burden of overcoming a presumption that neither he nor other like-situated juveniles can feasibly meet and which no other alleged juvenile offenders need meet. He also opposes the scheme's presumed minimum three-year incarceration provision on grounds that it violates the fundamental right of individual sentencing assessment enjoyed by other juvenile and criminal defendants in this state. We reject these and other equal protection arguments raised and affirm.

On February 3, 1994, Martin, a resident at Ethan Allen School for Boys—a secured correctional facility—was charged with a felony for allegedly hitting a youth counselor in the jaw contrary to § 940.20(1), STATS. (battery by a prisoner). Although Martin was a juvenile at the time of the offense and although juveniles charged with committing criminal offenses are initially routed through the juvenile system pursuant to §§ 48.12(1) and 48.18, STATS., the adult criminal court obtained jurisdiction over the case pursuant to a

---

[1] "Secured correctional facility" is defined as "a correctional institution operated or contracted for by the department for holding in secure custody persons adjudged delinquent." Section 48.02(15m), STATS.

recently enacted statute, § 48.183, STATS. This statute states in pertinent part:

> Notwithstanding ss. 48.12(1) and 48.18, courts of criminal jurisdiction have exclusive original jurisdiction over a child who is alleged to have violated s. 940.20(1) . . . while placed in a secured correctional facility.. . . [and] is subject to the procedures specified in chs. 967 to 979 and the criminal penalties provided for those crimes . . ..

When this statute was invoked, two other companion statutes were implicated. Section 970.032, STATS., requires that the preliminary hearing magistrate go beyond the usual job of determining whether a crime was committed and whether there is probable cause to believe that the defendant committed the crime. It also requires the magistrate to determine whether the child should be kept in the adult system or transferred to the juvenile court. *Id.* In what we term a "reverse waiver" procedure, the statute presumes that the child will be kept in the adult system unless it is found that the child cannot receive adequate treatment, that transfer would not depreciate the seriousness of the offense and that retaining jurisdiction is not necessary to deter the child or other children from further battery violations. Section 970.032(2)(a), (b), (c).

Section 939.635, STATS., requires a minimum sentence of three years imprisonment unless the court finds that placing the child on probation or imposing a lesser sentence would not depreciate the seriousness of the offense and would be sufficient to deter further batteries by the defendant or other juveniles in secured facilities.

Martin was produced before the adult court for an initial appearance and subsequently moved to dismiss the complaint on the grounds that all of the above stat-

utes, taken together, were unconstitutional. A court commissioner assigned to hear the motion agreed with Martin and dismissed the case. The State moved for reconsideration and Judge Joseph E. Wimmer overturned the court commissioner's ruling, found the statutes constitutional, denied the motion to dismiss and reinstated the felony proceeding. Martin petitioned for leave to appeal and we granted it.

Meanwhile, after the court commissioner found the adult prosecution unconstitutional, but before it was reinstated by Judge Wimmer, the State filed a delinquency petition in the juvenile branch of the circuit court regarding the same accusation. The State thereafter sought a declaratory ruling from the juvenile court, Judge J. Mac Davis presiding, that it had no jurisdiction to entertain the juvenile proceeding because of § 48.183, STATS. Judge Davis agreed with the State and Martin appealed Judge Davis's order. Martin then moved to consolidate the two appeals. We granted consolidation.

■

Martin launches several constitutional arguments, all of them sounding completely in equal protection. We will address these arguments in turn, but first we must determine the requisite level of judicial review. The principles to be applied when analyzing a statute challenged on equal protection grounds have been discussed at length in Wisconsin cases. *See State v. Hart,* 89 Wis. 2d 58, 64-65, 277 N.W.2d 843, 846 (1979). Briefly, if a statute affects a "fundamental right" or creates a classification based on a "suspect" criterion, we review the statute with "strict scrutiny." *State v. Annala,* 168 Wis. 2d 453, 468, 484 N.W.2d 138, 144 (1992). Otherwise, the appropriate analysis is the "rational basis test" which determines

whether the legislative classification rationally furthers a purpose identified by the legislature. *Id.*

Fundamental rights are those which are either explicitly or implicitly based in the Constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973). Rights that have been determined fundamental are procreation, *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942); voting, *Dunn v. Blumstein*, 405 U.S. 330 (1972); access to the courts, *State v. Neave*, 117 Wis. 2d 359, 344 N.W.2d 181 (1984); freedom of travel, *Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled on other grounds* by *Edelman v. Jordan*, 415 U.S. 651, 671 (1974); and the rights guaranteed by the First Amendment of the Constitution.

When the courts speak of a "suspect" class, they look to "traditional indicia of suspectness." *Regents of the Univ. of California v. Bakke*, 438 U.S. 265, 357 (1978) (quoted source omitted). Traditional indicia are found when there is a history of such purposeful unequal treatment, political powerlessness or imposition of special disabilities such that the courts command extraordinary protection from the majoritarian political process. *Id.* Persons generally are placed in these suspect classes by accident of birth. *See Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). Examples of suspect classes are race, alienage and national origin. *Shannon & Riordan v. Board of Zoning Appeals*, 153 Wis. 2d 713, 727, 451 N.W.2d 479, 484 (Ct. App. 1989). Another example is where a statute classifies by sex. *Frontiero v. Richardson*, 411 U.S. 677 (1973); *see also Sail'er Inn, Inc. v. Kirby*, 485 P.2d 529 (Cal. 1971).

Martin does not appear to argue that he is a member of a suspect class. His argument is that he is a juvenile singled out for disparate treatment. Even if he

were to argue that he is a member of a suspect class, his argument would be unavailing since none of the markers for determining a suspect class is identified here. He has not, for example, been placed in a class that has been traditionally singled out for discrimination by accident of birth.

Martin does argue, however, that the new statutes affect a "fundamental right." He claims that it is a fundamental right that all criminal and juvenile defendants have the opportunity for a hearing with fair standards before they can be deprived of their liberty. He cites *In re Gault*, 387 U.S. 1, 13 (1967), for the proposition that government is required to extend elemental due process, including "basic fairness," to children accused of crimes. He maintains that when the legislature insisted on presumptively waiving alleged batterers like him to adult court, it placed a burden on him of overcoming the waiver presumption that he cannot in reality meet. He asks rhetorically: How will he be able to prove that keeping him in the adult system is not necessary to deter him *or others* from battering in a secured institution? How will he show that transferring him to juvenile court will not depreciate the seriousness of his action? He implicitly if not explicitly asserts that he has no real evidentiary tools which he can use to overcome the presumption of waiver. He claims that "basic fairness" requires that he has a fundamental right to an "individual assessment" of his suitability for treatment in the juvenile system.

Regarding sentencing criteria, he again maintains that "individual assessment" is a "hallmark of our justice system." He cites *State v. Borrell,* 167 Wis. 2d 749, 482 N.W.2d 883 (1992), for the proposition that a defendant's personality, demeanor, age, remorse and need for rehabilitative control are all individualized

assessments which are fundamental to our justice system. He argues that defendants in his class are not judged by these individualized criteria, but are forced to prove different things like the "deterrability" and "depreciation" factors referred to above in order to receive less than the three-year minimum penalty prescribed by the new statutes. He reiterates what he perceives to be the improbability of being able to prove the negative.

In Martin's view, to make him prove the absence of such things as deterrability or depreciation is contrary to fundamental due process. He argues that it is basically unfair because these presumptions are "undisprovable." He argues that he and similarly situated juveniles are being treated unequally because other criminal and juvenile defendants do not have to prove the "undisprovable." Rather, he claims, the others receive the benefit of traditional fairness.

Martin cites to a treatise on constitutional law by Professors Nowak, Rotunda and Young which he claims supports his position. The quote from the treatise is as follows: "When the government takes actions that burden the rights of a classification of persons *in terms of their treatment in a criminal justice system* it is proper to review these laws under the strict scrutiny standard for equal protection." JOHN E. NOWAK ET AL., CONSTITUTIONAL LAW 818-19 (1983) (emphasis added). Martin concludes that a fundamental right has been implicated here and strict scrutiny is the proper test, not the rational basis analysis. Strict scrutiny requires that the statute must be the least restrictive way of achieving a compelling governmental interest. *See Rodriguez*, 411 U.S. at 16-17. Martin argues that the statutes fail the strict scrutiny test.

We do not lightly dismiss Martin's contentions by holding, as the State would have us do, that the deprivation of liberty is not a fundamental right and since Martin's core argument is a deprivation of liberty assertion, Martin's claims must fail. The term "liberty interest" is a broad one that encompasses more than simply the specter of imprisonment. Some members of our present United States Supreme Court have reasoned that a liberty interest is "fundamental" if it is one "historically and traditionally protected against state interference." *Cf. Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 293-94 (1990) (Scalia, J., concurring). Past United States Supreme Court decisions confirm this ideal. The Court has found there to be a liberty interest in the right to privacy and the right of interstate travel; these liberty interests stand side by side with long-held due process guaranties such as the right to trial by jury. In short, our notions of "liberty" are inextricably entwined with our idea of physical freedom and self-determination. *Id.* at 287 (O'Connor, J., concurring). We conclude that we cannot answer Martin's challenge by simply waving it off as a personal liberty interest argument.

The correct question is whether the statutes under consideration violate the elaborate due process guaranties historically and traditionally protected against state interference. We conclude that the answer must be "no." Martin does not have a substantive due process right to individualized treatment either in the "reverse waiver" procedure or in sentencing because it is neither explicitly nor inherently found in the Constitution. *See generally United States v. Green*, 902 F.2d 1311, 1313 (8th Cir.), *cert. denied*, 498 U.S. 943 (1990). The kind and nature of considerations adherent to waiver and

655

sentencing are historically for the legislature to determine. In fact, the court in *United States v. Frank*, 864 F.2d 992, 1009-10 (3d Cir. 1988), *cert. denied*, 490 U.S. 1095 (1989), had this to say about the subject:

> The recognition of a substantive liberty interest in individualized treatment in sentencing would . . . be inconsistent with the generally accepted notion that both retribution, which focuses on the interests of the victim rather than the status of the defendant, and general deterrence, which focuses on the interests of society at large rather than the status of the defendant, are appropriate societal reasons for imposing sanctions.

Thus, not only is there no fundamental right to individualized sentencing and, by extension, to waiver hearings, but, historically and traditionally, the right to classify crimes and enact procedures that travel to "deterrability" and "depreciation" are for society. The voice of society in this country is the legislature. It follows that the legislature has the responsibility for enacting laws reflecting society's appreciation of the seriousness of one crime as opposed to another. The legislature also has the obligation to measure the kinds of sanctions that will, in society's judgment, best deter future criminality. We conclude that no fundamental interest is present here, and we will not, therefore, review the issues raised within the framework of a strict scrutiny analysis.

Rather, since the interest at stake here is one that is traditionally and historically a decision for the legislature to make, we use the "rational basis test." The genesis of this test was formulated by our United States Supreme Court. As that Court held in *McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961):

656

Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States *a wide scope of discretion in enacting laws which affect some groups of citizens differently than others.* The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. [Emphasis added.]

Thus, the State may classify different groups of citizens and ascribe certain procedures to those groups which may be different than other groups. That includes the narrowing or broadening of factors to consider in waiver, reverse waiver and sentencing. Only when the classification is arbitrary or irrational will the courts hold that there is no reasonable basis to justify the classification. *Omernik v. State,* 64 Wis. 2d 6, 18-19, 218 N.W.2d 734, 741-42 (1974). Thus, we turn to whether the classifications made by the legislature speak to arbitrariness or irrationality.

Martin points out that juveniles who allegedly batter while in a secured setting are subject to the new statutory scheme but juveniles who commit crimes of greater severity are not. He questions why a juvenile who allegedly murders someone on the street, for example, is initially routed through the juvenile system, while the alleged batterer in a secured institution must face this new statutory scheme. He contends that the classification he is in sets him apart from other juveniles in a manner that is arbitrary and irrational.

Martin also argues that juveniles in secured settings who commit crimes different from battery while in an institution do not face the new statutory scheme,

while he and juveniles in his classification must face this scheme.

Martin further takes issue with the statute requiring a minimum three-year prison sentence unless he can prove the absence of deterrability and depreciation of crime concerns. He points out that adults in secured settings who commit batteries while in prison do not face presumptive three-year minimum sentences.

We agree with the State and the two trial court judges, however, that the classification is neither irrational nor arbitrary. We begin by citing, as did Judge Wimmer, a New Jersey case, *State v. Lagares*, 601 A.2d 698, 705 (N.J. 1992). That court wrote that the legislature is entitled to recognize different degrees and types of harm and to strike at what it believes "more urgently needs repression." *Id.* We do not require that the legislature actually articulate the purpose or rationale supporting the classification. *See Heller v. Doe*, 113 S. Ct. 2637, 2642 (1993). Even if the classification results in "an imperfect fit between means and ends" or some "inequality," the court is required to accept the legislature's generalities. *Id.* at 2643 (quoted source omitted). The assumptions underlying the State's rationales may even be "erroneous, but the very fact that they are arguable is sufficient, on a rational basis review, to immunize the [legislative] choice from constitutional challenge." *Id.* at 2650 (quoted sources omitted).

The interest served by the statutes is obvious—to protect those who work in, visit or are confined in a secured correctional facility. The youths in these institutions are unlike any other juveniles who run afoul of the law. These youths would not be there in the first place unless, under § 48.34(4m)(b), STATS., they have been found "to be a danger to the public and to be in need of restrictive custodial treatment." Placement in a

secured facility is the least restrictive alternative for these juveniles. It is the ultimate restriction in our juvenile code. Some might coin it the "last resort." It goes almost without saying, therefore, that juveniles placed in a secured facility are those already determined to be dangerous to the public. That alone sets these juveniles apart from other juveniles who have not been found dangerous.

Additionally, there is a rational basis for implementing a different procedural scheme for juveniles who batter while in a secured institution than for juveniles in the community at large or juveniles in a secured institution who allegedly commit other crimes. Batteries in these institutions have been a source of increasing concern. The record demonstrates that in the calendar year 1992, there were thirty-eight direct assaults on staff. In 1993, there were thirty-nine through the first eight months of the year. Clearly, batteries are on the increase. As the court said in *Lagares*, the legislature has the right to "strike" at what needs "repression." *Lagares*, 601 A.2d at 705. The increasing incidence of violent acts within secured institutions justifies the legislature's singular response. We agree with the State's comment that "[t]he legislature may choose to address one evil at a time, as long as that choice is reasonable."

There is also a rational basis for presuming a minimum three-year imprisonment for juveniles who allegedly batter while in a secured setting even though adults in secured institutions do not face this minimum. While it is true that the juvenile institution is a secured setting, it is not like an adult prison. The focus in the State's secured correctional facilities is on care, protection, wholesome mental and physical development and rehabilitation. *See* § 48.01(1)(b), (c), STATS. In

each of the State's secured juvenile correctional facilities—Ethan Allen School, Lincoln Hills School and the female youth development center—the focus is on learning and rehabilitation. These institutions are schools—the idea is to teach. They are also counseling institutions so that the juveniles have an opportunity to alter their coping mechanisms and deal with the root causes of their past errant behavior.[2]

In the community at large, school-age children interact closely in the physical sense with peers, teachers and adult authority figures such as parents, school supervisors and the like. It is fitting and proper that society, through its government, try to simulate this type of atmosphere as much as possible in a secured setting for youth.

However, the secured institutions are housed by juveniles deemed too dangerous to be anywhere else but where they are. The fact that batteries have been a constant problem in secured institutions shows that these juveniles take advantage of the physical closeness and the comparative lack of strict restraint on their freedom of movement to act out their dangerous tendencies on others. Thus, the juveniles who commit batteries on staff and peers create a tension between society's goals of simulating a healthy school-like environment and society's need to maintain order and discipline among dangerous youth.

---

[2] *See generally* DIV. OF YOUTH SERVS., DEP'T OF HEALTH AND SOCIAL SERVS., PROGRAM DESCRIPTIONS—ETHAN ALLEN SCHOOL (1994); DIV. OF YOUTH SERVS., DEP'T OF HEALTH AND SOCIAL SERVS., PROGRAM DESCRIPTIONS—LINCOLN HILLS SCHOOL (1993). We take judicial notice of these documents because they are supported documents whose accuracy cannot be reasonably questioned. *See* § 902.01(2), STATS.

One reasonable means of preventing batteries by juveniles in a secured institution and thereby preserving the physical closeness that is unique to the juvenile secured setting is to threaten a more serious penalty for battery. The legislature obviously sought to increase the costs of unlawful conduct where the conventional remedies were deemed insufficient. The new statutory scheme increases the probability that severe punishment will be imposed. The expected punishment cost is obviously designed to make a juvenile disposed to battery risk-averse rather than risk-neutral or risk-prone. The record shows instances under the previous law where some juveniles, feeling the lack of serious consequences for their aberrant behavior, often openly stated that they would assault staff again at the next available opportunity. This reportedly created an atmosphere of fear and intimidation in the facilities for both staff and other youth.

However, it is a reasonable prediction that a juvenile contemplating such behavior will only commit aggression if the expected benefits to him or her (such as peer power) exceed the costs (such as a sentence in adult prison instead of staying at the juvenile facility). It is the legislature's responsibility to predict how much of a threatened sanction is necessary to create a risk-averse populace within the secured juvenile facility and translate the prediction into law. We cannot second guess that exercise of responsibility.

It is different with adults alleged to have committed a similar crime within a secured prison setting. As pointed out by the State, there is less need to act against adults because the adult institutions are already more secure and there is less likelihood of battery and assault to staff, visitors or other inmates. It is precisely because the secured correctional facilities for

juveniles are more open and less restricted that a higher cost to prevent wayward behavior is necessary for juveniles. The legislature was not required to, and did not, assume that adult institutions were suffering from similar increases in assaults and batteries that plagued secured juvenile settings.

Also, again as pointed out by the State, an adult inmate who commits a battery or assault in an institution may forfeit good time and thus increase the time he or she must serve until mandatory release. This is an additional deterrent to control such conduct. There is nothing comparable in the juvenile institution; juveniles do not earn good time credit.

Finally, the cost of facing imprisonment for the first time might be of greater significance to the juvenile and thereby cause risk-averse behavior whereas an adult facing a long prison term might not be so deterred. We conclude that there is ample justification for setting a presumptive minimum sentence for juveniles but not for adults who allegedly commit a battery within a secured institution.

We hold that the classifications are neither arbitrary nor irrational. The equal protection argument fails and we affirm both trial courts on the issues raised.

*By the Court.*—Orders affirmed.