**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**February 3, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP2585-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CF4573

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

NOAH Q. MANN-TATE,

DEFENDANT-APPELLANT.

APPEAL from orders of the circuit court for Milwaukee County: JANE VINOPAL CARROLL, Judge. *Reversed and cause remanded for further proceedings*.

Before White, C.J., Donald, and Geenen, JJ.

¶1 GEENEN, J. Noah Q. Mann-Tate, a juvenile defendant under adult criminal court jurisdiction for a charged crime committed when he was ten years old, appeals from nonfinal orders of the circuit court denying his motion for

reverse waiver to transfer jurisdiction to juvenile court under WIS. STAT. § 970.032(2) (2023-24),[1] or alternatively, to declare those reverse waiver provisions unconstitutional. "Reverse waiver" is the procedure by which an adult criminal court transfers a case against a juvenile offender to juvenile court, and § 970.032(2) sets forth three factors[2] that the juvenile must prove by a preponderance of evidence before the circuit court is permitted to grant reverse waiver. Mann-Tate argues that the statutory factors set forth in § 970.032(2) are unconstitutionally incomplete and violate due process because they do not require the circuit court to consider the unique attributes of youth identified by the United States Supreme Court[3] before deciding whether to transfer jurisdiction to juvenile court.

¶2 We agree with Mann-Tate. We conclude that the standard set forth in WIS. STAT. § 970.032(2) for determining whether reverse waiver is appropriate is unconstitutional to the extent it does not require circuit courts to consider the unique attributes of youth identified by the United States Supreme Court. Accordingly, we reverse the circuit court's orders and remand the cause to the circuit court to consider the reverse waiver issue anew applying the correct standard of law.

---

[1] This court granted leave to appeal the order. *See* WIS. STAT. RULE 809.50(3). All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

[2] WISCONSIN STAT. § 970.032(2)(a)-(c) states that the court shall retain jurisdiction unless the juvenile proves, by a preponderance of the evidence, that "if convicted, the juvenile could not receive adequate treatment in the criminal justice system"; that transferring jurisdiction to juvenile court would not "depreciate the seriousness of the offense"; and that retaining jurisdiction is unnecessary in order to deter the juvenile, or other juveniles, from committing the same offense.

[3] *See, e.g.*, ***Miller v. Alabama***, 567 U.S. 460 (2012); ***Graham v. Florida***, 560 U.S. 48 (2010); ***Roper v. Simmons***, 543 U.S. 551 (2005).

BACKGROUND

¶3      On January 19, 2023, the State filed a criminal complaint alleging that ten-year-old Mann-Tate committed first-degree intentional homicide.  *See* WIS. STAT. § 940.01(1)(a).  According to the complaint, on November 21, 2022, police responded to a report of a shooting at Mann-Tate's residence and found Mann-Tate's mother deceased.  Police interviewed Mann-Tate, who said that his mother woke him up at 6:00 a.m.  Mann-Tate told police that he went to his mother's bedroom, got her gun, and then went down to the basement where she was grabbing some laundry.  He originally described twirling the gun around on his finger and then it "accidentally went off."  Mann-Tate then woke up his sister, who discovered their mother was deceased, and called 911.  Police spoke with the medical examiner, who said that Mann-Tate's mother died from a gunshot wound to the head at close range.  After being interviewed, Mann-Tate was allowed to remain with family.

¶4      Mann-Tate's family contacted the police department the next morning, and two detectives returned to speak with them.  Mann-Tate's older sister told police that Mann-Tate had "rage issues" and acted out.  She said that about six months earlier, Mann-Tate filled a balloon with flammable liquid and set it on fire, causing it to explode and set their couch and carpet on fire and that, when his mother asked him why he would do something like that, Mann-Tate said that his sisters told him to do it.  Further questioning[4] led Mann-Tate to explain that he has five imaginary people who talk to him: two sisters, one old lady, one

---

[4] It is unclear in the record whether the questioning was done by Mann-Tate's mother after the fire balloon incident or by police during their investigation of Mann-Tate's mother's death.

guy, and lastly, someone who Mann-Tate does not like speaking to because that person is mean to him. Mann-Tate's sister told police that Mann-Tate was seeing a therapist, and she reported seeing paperwork from the therapist "who gave him a concerning diagnosis." His sister also reported that Mann-Tate logged into their mother's Amazon account and ordered a virtual reality headset on November 22, 2022, the morning after their mother's death.

¶5      Mann-Tate's maternal aunt told police about previous concerning incidents involving Mann-Tate. She said that when Mann-Tate was four years old, he picked up his puppy and swung it around by the tail. She also told detectives that Mann-Tate had attacked her son to the point that she had to pull Mann-Tate off of him.[5]

¶6      The complaint also alleges that Mann-Tate made untruthful statements to police. He originally told police he was not mad at his mother, but then admitted that he was mad that she woke him up half an hour early; he initially told police he pried open the gun safe, but he later admitted that he got the keys the night before and hid them in his nightstand, then got the gun from the gun safe the next morning when his mother woke him up; he first said he asked his mother whether the gun was real, but he later admitted he did not say anything to his mother but that she walked toward him and told him to put the gun down; he originally told police that he had been twirling the gun around his finger when the gun "accidentally went off," but he later admitted that he had not been twirling the gun; that when a cousin told him he could go to jail for a long time, he tried to

---

[5] In a later interview with a defense investigator, Mann-Tate's aunt said that the statement in the complaint about Mann-Tate's attack on her son was not true and that it was not a physical attack requiring her to pull Mann-Tate off of her son.

come up with different stories, and that he was nervous and did not know what to do when the bullet hit his mother, so he tried to fake that he was innocent; and that he was not truthful when he said that his mother ordered the virtual reality headset.

¶7      Based on the charge and Mann-Tate's age, the adult criminal court had original jurisdiction under WIS. STAT. § 938.183(1)(am).   Mann-Tate's attorneys requested a competency evaluation, and a contested competency hearing was held over two days.  Following testimony and party arguments, the circuit court found that Mann-Tate, then-eleven years old, with average-to-below-average intelligence for an eleven-year-old, was competent to proceed as an adult in adult court.

¶8      The circuit court held a preliminary hearing at which a detective testified consistently with the facts alleged in the complaint.  Based on this testimony, the court found there was probable cause to believe that Mann-Tate committed first-degree intentional homicide.  The case then proceeded to a reverse waiver hearing.   Doctors and social workers testified regarding Mann-Tate's medical and mental health history, his likelihood of responding favorably to treatment and his treatment needs, and the services available to juveniles in both the juvenile court and adult criminal court systems, including the extensive waitlist of over 10,000 individuals for cognitive behavioral programming in the adult court system.  The court also heard testimony and accepted letters from family members to assist with its determination of whether reverse waiver would depreciate the seriousness of the offense.

¶9      Mann-Tate filed a motion to dismiss original adult court jurisdiction, challenging the constitutionality of the reverse waiver statutes.  After hearing arguments, the circuit court denied the motion.  It explained:

This court is bound by Wisconsin precedent but recognizes the uphill battle faced by defendants seeking to prove the elements of [WIS. STAT.] § 970.032(2), particularly with a young defendant and at this point in the proceedings. In addressing the seriousness of the offense, only preliminary hearing testimony has been heard, and the defendant is presumed innocent. He retains his right to challenge the admissibility of evidence against him, cross[-]examine witnesses and to proffer a defense. Particularly in a homicide prosecution, there are often lesser included offenses involving intent v[ersus] recklessness. In addressing treatment in the adult system, again there are many unknown elements at this stage, the first of which is the treatment needs of the defendant. The younger the defendant, the more their treatment needs will change over time. A 10 to 12-year-old defendant has not even gone through puberty. Just like the conviction is unknown, the sentence is also unknown and will ultimately require the court to consider a variety of factors. If given an adult sentence, an offender remains in the custody of juvenile corrections until age 17; so the treatment in the adult system, in the case of a 10-year-old defendant, begins seven years into the future. Just as treatment needs are not static, treatment services available are not constant, either. There is no reason to assume that the treatment services available in the adult system today will be the same as the ones available when a juvenile defendant enters it at some future date.[6] Finally, the third element that a juvenile must prove involves either specific or general deterrence. The effect of one case on general deterrence is simply impossible to know or measure but is likely negligible in almost all cases. The question of whether the juvenile will commit another homicide in the future is, again, complicated by their young age. They haven't lived long enough to establish a pattern of behavior, their brains and personalities are still in development, and their mental health is subject to change as well.

---

[6] We observe the irony of the circuit court's reasoning that the younger a juvenile offender is, the less likely it will be that the juvenile can prove that he or she will not receive adequate treatment in the adult criminal justice system because the younger the juvenile is, the longer it will be before that juvenile is transferred to the adult corrections system, and the available treatment services in the adult system could change during that time.

¶10     After denying Mann-Tate's motion to dismiss, the circuit court denied Mann-Tate's reverse waiver motion. Regarding the first statutory factor of WIS. STAT. § 970.032(2), that Mann-Tate could not receive adequate treatment in the adult criminal justice system, the court noted that "[t]he difficulty with proving that is first identifying what needs does this defendant have and what needs will he have when he enters the adult system. It's complicated even more by his age being ten years old." The court found that there was no diagnosis that would allow it to determine what Mann-Tate's needs are, and that it was unknown whether Mann-Tate would need mental health treatment in the adult system. The court concluded that, because Mann-Tate's needs were unknown, "the defendant has not proven that, if convicted, he could not receive adequate treatment in the criminal justice system."

¶11     With respect to the second factor, the court noted that "[t]his offense is a first-degree intentional homicide. It is very aggravated." The court stated that it was required to make the determination of whether transferring jurisdiction would depreciate the seriousness of the offense based on preliminary hearing testimony, which indicated that there was preplanning, that Mann-Tate took the keys to the gun safe, then went downstairs to confront his mother, and shot her at close range. The court also considered the impact on the victims, noting that the family supported Mann-Tate but did not agree on whether Mann-Tate should be in juvenile or adult court. The court concluded that it is an "extremely aggravated offense, and it has not been proven on this record that transfer to juvenile court would not depreciate the seriousness of the offense." Finally, while considering the third factor of deterrence, the court explained that the State had conceded, and the court agreed, that there is nothing that one court does in one case that affects general deterrence.

¶12    The court found that the most compelling reason to keep Mann-Tate in the juvenile system was his age.  The court explained that it did not believe ten-year-old children belong in the adult system, but that the court was required to consider only the statutory factors listed in WIS. STAT. § 970.032(2).  It explained:

> What is extremely—the factor in this case that is the most compelling for keeping this youth in the juvenile system is his age.  He was ten years old at the time that he committed this offense.  He is now twelve years old.  And our feeling that if ten-year-olds do not belong in the adult system, and, as a juvenile court judge, that I would agree with that statement.  But that's not my job.  That is a legislative determination.
>
> The legislature has clearly indicated that ten-year-olds who are charged with first-degree intention[al] homicide do belong in the adult system, unless those statutory factors are all proven by a preponderance of the evidence with the burden being on the defendant.
>
> …
>
> So I am concluding that the defense has not met their burden in proving that [Mann-Tate] could not receive adequate treatment in the adult system, that transferring jurisdiction to the juvenile court would not depreciate the seriousness of the offense, and the motion to reverse waive him into the juvenile court is denied.

¶13    Mann-Tate filed a petition for leave to appeal the circuit court's nonfinal orders denying the motions to dismiss original jurisdiction on constitutional grounds, and for reverse waiver.  We granted Mann-Tate's petition.

## DISCUSSION

¶14    Mann-Tate's constitutional argument focuses on a juvenile's right to due process at the reverse waiver hearing.  Mann-Tate argues that by creating the reverse waiver procedure, the legislature created a liberty interest that triggers due process protections.  Specifically, Mann-Tate asserts that several United States

8

Supreme Court cases have emphasized the difference between adults and juveniles in the criminal justice system, and because the reverse waiver statute does not require the circuit court to consider the distinctive attributes of youth identified in these cases, the statute no longer provides the required due process protection to children whose cases originate in the adult criminal system.

¶15   The constitutionality of a statute is a question of law that we review de novo. *State v. Cole*, 2003 WI 112, ¶10, 264 Wis. 2d 520, 665 N.W.2d 328. Statutes are presumed constitutional, and a party challenging the constitutionality of a statute bears the "heavy burden" of proving beyond a reasonable doubt that the statute is unconstitutional. *Id.*, ¶11.

¶16   For the reasons detailed below, we agree with Mann-Tate. We conclude that the standard set forth in WIS. STAT. § 970.032(2) for determining whether reverse waiver is appropriate is unconstitutional to the extent it does not require circuit courts to consider the unique attributes of youth identified by the United States Supreme Court. Our analysis is organized as follows: First, we discuss the history of the statutes establishing original adult court jurisdiction and the reverse waiver procedure. Second, we summarize the unique attributes of youth identified by the United States Supreme Court, and we conclude that due process requires consideration of those attributes by the circuit court before determining whether to grant reverse waiver. Third, and finally, we summarize and reject the State's arguments.

**I.   History of original adult criminal jurisdiction and reverse waiver statutes.**

¶17   The legislature first provided the adult criminal court with jurisdiction over certain children in 1993. 1993 WIS. ACT 98. Under the new

statutes, the criminal court was granted exclusive original jurisdiction over any child with a previous adjudication who was alleged to have committed battery or aggravated assault while placed in a secured juvenile facility, unless the court transferred jurisdiction to the children's court through the reverse waiver process. WIS. STAT. § 48.183 (1993-94).

¶18 Under the new reverse waiver procedure, once the court found probable cause to believe that the child committed one of those offenses, the court was required to retain jurisdiction unless it found all of the following: (1) that, if convicted, the child would not receive adequate treatment in the criminal justice system; (2) that transferring jurisdiction to children's court would not depreciate the seriousness of the offense; and (3) that retaining jurisdiction was not necessary to deter the child or other children from committing battery, aggravated assault, or other similar offenses while placed in a secure correctional facility. WIS. STAT. § 970.032 (1993-94). If the child remained in criminal court and was convicted of one of the adult jurisdiction offenses, the court was required to sentence the child to a presumptive minimum prison sentence unless the court determined that placing the child on probation or imposing a lesser sentence would not depreciate the seriousness of the offense or was not necessary for purposes of deterrence. WIS. STAT. § 939.635 (1993-94).

¶19 In 1995, the Juvenile Justice Study Committee was created to study the effectiveness of the Children's Code and state and county resources in providing "responses to delinquent behavior by children that promote public safety, accountability and rehabilitation." 1993 WIS. ACT 377. In its report *Juvenile Justice: A Wisconsin Blueprint for Change*, the Committee recommended sweeping reforms that the legislature subsequently adopted. It removed the

10

delinquency provisions from WIS. STAT. ch. 48 and created WIS. STAT. ch. 938, the Juvenile Justice Code.[7]

¶20    Among other changes, ch. 938 lowered the age of delinquency from twelve years old to ten years old, *compare* WIS. STAT. § 48.12(1) (1993-94) *with* WIS. STAT. § 938.12 (1995-96), and original adult court jurisdiction was expanded to include homicides or attempted homicides committed by children who were at least ten years old, § 938.183 (1995-96).  The criteria regarding deterrence now required the court to determine whether retaining jurisdiction was not necessary to deter the child or other children from committing the offense for which the child was now under original adult court jurisdiction.  1995 WIS. ACT 77 § 669.  The legislature later changed the language of WIS. STAT. § 970.032(2) to place the burden on the child to prove the three criteria for transferring adult jurisdiction by a preponderance of the evidence, rather than having the court make findings regarding the three criteria.  1995 WIS. ACT 352 § 134.

¶21    Thus, under the current version of the statutes, the adult criminal court has exclusive original jurisdiction over juveniles who are alleged to have committed certain offenses, including first-degree intentional homicide.  Although the criminal court has exclusive original jurisdiction, WIS. STAT. § 970.032(2) allows the accused juvenile to seek transfer of his or her case to juvenile court through the reverse waiver procedure.  First, the criminal court must find probable

---

[7] In explaining the need for a separate Juvenile Justice Code, the Committee stated that the term "children" was "misleading when it is applied to law violators who often are physically and mentally mature and who have demonstrated a willingness to engage in serious and even heinous acts." *Juvenile Justice: A Wisconsin Blueprint for Change* at 13, Juvenile Justice Study Committee, (January 1995), https://files.eric.ed.gov/fulltext/ED384129.pdf.  It continued: "The words 'child' and 'children' are inappropriate when applied to such individuals." *Id.*

cause to believe that the juvenile has committed the violation that provided the court with original jurisdiction. Sec. 970.032(1). If it does, the criminal court proceeds to a reverse waiver hearing. The criminal court must retain jurisdiction unless the juvenile proves each of the following criteria by a preponderance of the evidence: (1) that the juvenile, if convicted, could not receive adequate treatment in the criminal justice system; (2) that transferring jurisdiction to the juvenile court would not depreciate the seriousness of the offense; and (3) that retaining jurisdiction is not necessary to deter the juvenile or other juveniles from committing the same violation as the accused. Sec. 970.032(2).

## II. Unique attributes of youth identified by the United States Supreme Court and their application to reverse waiver proceedings.

¶22 Approximately ten years after the creation of Wisconsin's reverse waiver statute, the United States Supreme Court fundamentally altered the way in which juveniles are treated in the criminal justice system. In particular, the Supreme Court decided several cases, grounded in the Eighth Amendment's prohibition against cruel and unusual punishment, distinguishing juveniles and adults for purposes of sentencing. Mann-Tate argues that although the Court identified these distinctions in the context of resolving Eighth Amendment issues, the Court did not limit the relevancy of these distinctions to Eighth Amendment issues. We agree with Mann-Tate.

¶23 In *Roper v. Simmons*, 543 U.S. 551, 570-71 (2005), the Supreme Court concluded that imposing the death penalty on an individual for crimes committed before the age of 18 constitutes cruel and unusual punishment because juveniles as a class are less culpable than adults. The Court supported its decision with both common sense and scientific studies, highlighting three general differences between juveniles and adults which "demonstrate that juvenile

offenders cannot with reliability be classified among the worst offenders." *Id.* at 569.

¶24 First, the Court explained that a "'lack of maturity and an underdeveloped sense of responsibility'" are more frequently found in juveniles than in adults, often resulting in "'impetuous and ill-considered actions and decisions.'" *Id.* (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). Second, the Court recognized that "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure" because "juveniles have less control, or less experience with control, over their own environment." *Roper*, 543 U.S. at 569. "The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570. For these reasons, the Court concluded that the Eighth Amendment prohibited the imposition of the death penalty on juveniles under 18:

> These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed. Indeed, the relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.

*Id.* (citation modified).

¶25    Five years later, in *Graham v. Florida*, 560 U.S. 48, 74 (2010), the Supreme Court held that sentences of life in prison without the possibility of parole for juveniles convicted of crimes other than homicide constitutes cruel and unusual punishment.  After summarizing the distinctions *Roper* drew between juveniles and adults, the Court concluded that there was no reason to reconsider those distinctions.  In fact, "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68.  The Court explained that, in light of the unique characteristics of youth, "none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification" for sentencing non-homicide juvenile offenders to life in prison without parole. *Id.* at 71 (citation modified).  It stated that "criminal procedure laws that fail to take defendants' youthfulness into account at all would be flawed." *Id.* at 76.

¶26    The *Graham* Court also discussed the "special difficulties encountered by counsel in juvenile representation." *Id.* at 78.  It explained:

> [T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings.  Juveniles mistrust adults and have limited understandings of the criminal justice system and the roles of the institutional actors within it.  They are less likely than adults to work effectively with their lawyers to aid in their defense.  Difficulty in weighing long-term consequences; a corresponding impulsiveness; and reluctance to trust defense counsel, seen as part of the adult world a rebellious youth rejects, all can lead to poor decisions by one charged with a juvenile offense.  These factors are likely to impair the quality of a juvenile defendant's representation.

*Id.* (citations omitted).

¶27    In *Miller v. Alabama*, 567 U.S. 472, 479 (2012), the Supreme Court held that a mandatory sentence of life in prison without the possibility of parole for a homicide committed by a juvenile constitutes cruel and unusual punishment. While reaffirming the differences between juvenile and adult offenders, the Court observed that in the years since *Roper* and *Graham* were decided, "the science and social science supporting" those decisions "have become even stronger." *Miller*, 567 U.S. at 472 n.5. The Court quoted the amicus brief filed by the American Psychological Association, stating that "[i]t is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." *Id.* It concluded that mandatory sentences of life without parole imposed upon juveniles violates the Eighth Amendment because the mandatory nature of the sentence precludes the sentencer from considering the unique characteristics of youth in determining a proportional sentence for the crimes committed. *Id.* at 473-74.

¶28    Moreover, the Court considered and rejected the argument that the discretion available to a judge at waiver and reverse waiver hearings allowed states to subject some juveniles to a possible mandatory life sentence for homicide. *Id.* at 487-89. Alabama argued that a categorical ban on mandatory life sentences without parole for juveniles was unnecessary because "individualized circumstances come into play in deciding whether to try a juvenile offender as an adult" or transfer the matter to juvenile court. *Id.* at 480. The Court concluded that "[e]ven when States give transfer-stage discretion to judges, it has limited utility." *Id.* at 488. It explained that "the decisionmaker typically will have only partial information at this early, pretrial stage about either the child or the

circumstances of his [or her] offense." *Id.* "The key moment for the exercise of discretion is the transfer," and at that point, "the judge often does not know then what [he or] she will learn, about the offender or the offense, over the course of the proceedings."[8] *Id.*

¶29 Mann-Tate argues that although these cases dealt with Eighth Amendment claims, the relevance of the distinctions between juveniles and adults is not limited to Eighth Amendment claims. That is, the distinctive attributes of youth identified by the Court are not constitutionally irrelevant before sentencing; instead, these attributes inform what process is due to juveniles whose cases originate in the adult criminal justice system.

¶30 An individual's due process rights are rooted in the Fourteenth Amendment to the United States Constitution and article I, sections 1 and 8 of the Wisconsin Constitution. "[D]ue process is a fundamental requirement in both the criminal and juvenile courts[.]" *State v. Tawanna H.*, 223 Wis. 2d 572, 579, 590 N.W.2d 276 (Ct. App. 1998). "[T]he concern of due process is fundamental fairness." *State ex rel. Lyons v. De Valk*, 47 Wis. 2d 200, 205, 177 N.W.2d 106 (1970). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

¶31 It is well settled that legislatures can create statutorily protected liberty interests that implicate due process protections. *Kent v. United States*, 383 U.S. 541, 557, 562 (1966). Once the right to be treated as a juvenile is provided

---

[8] We observe that the juvenile offenders in *Roper*, *Graham*, and *Miller* were all substantially older at the time of their alleged offenses than was Mann-Tate at the time of his alleged offense.

by statute, due process demands that a court conduct a "meaningful review" prior to waiving a juvenile into adult court. *Id.* at 561-62. Due process requires that the waiver proceeding include an adversarial hearing, effective assistance of counsel, and a statement of reasons for the court's decision. *Id.* at 560-62. The Court in *Kent* determined that a waiver decision requires the due process protections of meaningful review because it is a "critically important" proceeding determining "vitally important statutory rights of the juvenile." *Id.* at 556, 560. Although *Kent* did not dictate what exact criteria a court must consider in determining whether to waive juvenile jurisdiction, it suggested factors that many states, including Wisconsin, incorporated into their waiver statutes. *See* WIS. STAT. § 938.18(5); *Kent*, 383 U.S. at 566-67. These factors include the juvenile's mental maturity and apparent potential for responding to future treatment. Sec. 938.18(5)(a); *Kent*, 383 U.S. at 567 (including "[t]he sophistication and maturity of the juvenile as determined by consideration of his [or her] home, environmental situation, emotional attitude and pattern of living" as one of several "determinative factors" in the decision to waive juvenile court jurisdiction).

¶32 It is likewise well settled that the distinctions drawn between juveniles and adults in *Roper*, *Graham*, and *Miller* have application in areas other than criminal sentencing. For example, in *J.D.B. v. North Carolina*, 564 U.S. 261, 272, 277 (2011), the Court concluded that age is an important factor for purposes of *Miranda* custody analysis and that children should not be held to the same standard as adults. The Court observed that police officers and judges "simply need the common sense to know that a 7-year-old is not a 13-year-old and neither is an adult." *J.D.B.*, 564 U.S. at 279-80. Thus, it is not true that a juvenile's age is constitutionally relevant only during sentencing in adult criminal court. A juvenile's age is "more than a chronological fact," and the Court had no

17

trouble concluding that the impact of a juvenile's youthfulness carries constitutional significance in other contexts of the criminal justice process.[9] *Id.* at 272 (citation omitted).

¶33    The Supreme Court's jurisprudence with respect to how children are treated when they are suspected of having committed a crime has been driven by the science of adolescent[10] brain development.  Because children's characters are not well formed, and because children are more capable of change, "a greater possibility exists that a minor's character deficiencies will be reformed."  *Roper*, 543 U.S. at 570.

¶34    The problem, then, is that WIS. STAT. § 970.032(2) does not require consideration of the impacts of the juvenile's youth before determining whether the juvenile is tried as an adult.  Without consideration of these characteristics of youth, children for whom the juvenile system is more appropriate may remain in the adult system because the three reverse waiver criteria do not require the court to consider information that is fundamental to determining whether a juvenile should remain in criminal court or be waived to juvenile court, including the

---

[9] The State points out that *J.D.B. v. North Carolina* is not a constitutionally based decision because it is an extension of *Miranda v. Arizona*, and "*Miranda* is a prophylactic rule not required by the Constitution but designed to prevent defendants from being compelled to incriminate themselves in the inherently coercive environment of questioning while in police custody."  While this is a correct characterization of *Miranda*, the State misses the broader point, which is that the impact of a juvenile's youthfulness is a constitutionally relevant factor that must be considered in other critical stages of the criminal justice process and is not limited in application to only adult criminal court sentencing of juvenile offenders.

[10] It is unclear whether Mann-Tate was an "adolescent" as of the date of his alleged crime (i.e., ten years old) or the date the circuit court denied his reverse waiver motion (i.e., twelve years old).  Notably, however, the circuit court concluded that at the time it denied Mann-Tate's reverse waiver motion, Mann-Tate had not even started puberty.  The science of adolescent brain development that drove the outcomes in *Roper*, *Graham*, and *Miller* may therefore carry increased weight when the juvenile is not, biologically, an adolescent and is still a child.

juvenile's capacity for reform and rehabilitation. Section 970.032(2), in its current form, violates due process because it does not provide a meaningful opportunity for a juvenile to prove that he or she is not one of the "rare and unfortunate cases" that warrant treating the juvenile as having the same culpability as an adult. *See Graham*, 560 U.S. at 109 (Thomas, J. dissenting).

¶35 In particular, the criterion of whether waiver would depreciate the seriousness of the offense fails to consider how the unique characteristics of youth impact the seriousness of any given offense. The Supreme Court decisions described above require courts to acknowledge that a youth who commits an offense is less culpable than an adult who commits the same offense. The reverse waiver procedure is rendered functionally meaningless if courts are not required to consider that children's "'lack of maturity and … underdeveloped sense of responsibility'" leads them to poor decision making. *Roper*, 543 U.S. at 569 (citation omitted). This concept is so fundamental that the Supreme Court described it as something "any parent knows[.]" *Id.*

¶36 In *Miller*, the Court provided six characteristics that should be considered during sentencing in light of the differences between adults and children: (1) the juvenile's chronological age related to immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's family and home environment that surrounds him or her; (3) the circumstances of the offense, including the extent of participation in the criminal conduct; (4) the impact of familiar and peer pressures; (5) the effect of the offender's youth on his or her ability to navigate the criminal justice process; and (6) the possibility of rehabilitation. *Miller*, 567 U.S. at 477-78. These factors mirror the factors used during a waiver hearing (i.e., from juvenile to adult court), and they ensure due process for the juvenile whose case is subject to original juvenile court

jurisdiction. WIS. STAT. § 938.18(5). In our view, the reverse waiver statute, WIS. STAT. § 970.032(2), is constitutionally incomplete without consideration of these factors.[11] Moreover, the Supreme Court explained that not all juveniles are equally impacted by these unique attributes of youth; common sense recognizes that "a 7-year-old is not a 13-year-old and neither is an adult." *J.D.B.*, 564 U.S. at 279-80. Accordingly, these factors may take on more or less significance based on the juvenile offender's chronological age.

### III. The State's arguments supporting the constitutionality of WIS. STAT. § 970.032(2) are not persuasive.

¶37 The State makes several arguments supporting the constitutionality of WIS. STAT. § 970.032(2). We address each of these arguments in turn, but we are not persuaded by any.[12]

¶38 First, we address the State's framing of the standard of review applicable to our analysis. In its brief, the State discusses what level of scrutiny applies to WIS. STAT. § 970.032(2) (*e.g.*, rational basis review or strict scrutiny). In our view, identification of an applicable level of scrutiny is unnecessary in this

---

[11] We reject the assertion that the Supreme Court cases described above have no applicability outside of criminal sentencing of a juvenile in the adult court system. In a practical sense, the reverse waiver procedure is quasi-sentencing in nature. Indeed, the three reverse waiver factors set forth in WIS. STAT. § 970.032(2) are themselves sentencing factors. *See State v. Gallion*, 2004 WI 42, ¶44, 270 Wis. 2d 535, 678 N.W.2d 197; *State v. Odom*, 2006 WI App 145, ¶7, 294 Wis. 2d 844, 720 N.W.2d 695; *State v. Ziegler*, 2006 WI App 49, ¶23, 289 Wis. 2d 594, 712 N.W.2d 76. In our view, it is erroneous to conclude that the unique attributes of youth identified by the Supreme Court and applied at other critical stages of the criminal justice process can be ignored during the reverse waiver process when the reverse waiver process itself requires the adult criminal court to consider three specific sentencing factors to determine whether it must retain jurisdiction over the juvenile.

[12] The State argues that Mann-Tate's constitutional argument is undeveloped. We disagree. We have no trouble discerning the arguments Mann-Tate makes in his briefs, and those arguments are well supported by applicable case law.

case. In ***State v. Fitzgerald***, 2019 WI 69, 387 Wis. 2d 384, 929 N.W.2d 165, our supreme court faced a problem similar to the one presented in this case. In ***Fitzgerald***, the court held that Wisconsin's involuntary medication statute was unconstitutional to the extent it allowed the administration of involuntary medication without consideration of the factors set forth in ***Sell v. United States***, 539 U.S. 166 (2003). ***Fitzgerald***, 387 Wis. 2d 384, ¶2. The court in ***Fitzgerald*** never discussed or applied any level of scrutiny in its analysis.

¶39 We view this case as similar to ***Fitzgerald*** because Mann-Tate's argument is that a state statute—i.e., WIS. STAT. § 970.032(2)—is constitutionally incomplete because it allows a juvenile to remain under adult court jurisdiction without requiring the circuit court to consider constitutionally relevant criteria set forth by the Supreme Court cases described above. The question is whether those Supreme Court cases require courts to consider the unique impact of the juvenile's youthfulness when deciding whether to transfer jurisdiction to juvenile court, and if so, whether § 970.032(2) already requires consideration of those factors. No reference to or analysis of the different degrees of scrutiny is necessary to resolve that question.

¶40 The State argues that the statutory factors set forth in WIS. STAT. § 970.032(2) already account for the impact of the juvenile's youthfulness. In particular, the State says that "[i]t would not make any sense for a court *not* to consider the 'impact of youthfulness' when determining whether the juvenile could receive adequate treatment in the criminal justice system and whether a juvenile disposition would depreciate the seriousness of the offense." The problem with the State's argument is two-fold. First, as Mann-Tate highlights, the text of § 970.032(2) does not support the State's argument. In contrast to WIS. STAT. § 938.18(5), the text of § 970.032(2) does not require consideration of

"[t]he personality of the juvenile," "the juvenile's physical and mental maturity," or "the juvenile's pattern of living[.]" While the Juvenile Justice Code is designed to consider the unique attributes of a juvenile offender's youth, these are not required considerations under the criminal code, where the reverse waiver statute is housed.

¶41 Second, in its brief, the State relies on *State v. Kleser*, 2010 WI 88, ¶¶77-84, 328 Wis. 2d 42, 786 N.W.2d 144, to support its argument that the factors set forth in WIS. STAT. § 970.032(2) encompass the factors set forth in WIS. STAT. § 938.18(5). However, the circuit court specifically asked the parties whether they believed it was required under *Kleser* to consider the waiver factors under § 938.18(5), and the State took the position that the court cannot import factors from § 938.18(5) into § 970.032(2). Moreover, *Kleser* does not support the argument that courts must consider factors set forth in § 938.18(5) during a reverse waiver proceeding under § 970.032.

¶42 The State argues that Mann-Tate's rights are not implicated in this case because the legislature was not required to provide a juvenile court substitute for the adult criminal justice system at all, for any juvenile. Moreover, because Mann-Tate is alleged to have committed an original adult jurisdiction crime, he never had the statutory right to have his case heard in juvenile court. However, in our view, the State misidentifies the right at issue. It is true that the legislature did not have to create an alternative criminal justice court for juveniles, but it did, and within that structure, the legislature created a procedure by which juveniles like Mann-Tate could have their cases transferred to juvenile court if they prove the statutory criteria by a preponderance of the evidence. In other words, Mann-Tate has a statutory right to the reverse waiver procedure, and *Kent* requires a meaningful hearing that comports with due process.

22

¶43    The State argues that Mann-Tate has no substantive due process right to participate in the juvenile court system. The State claims that prior binding decisions have already rejected the heart of Mann-Tate's argument that he has a fundamental liberty interest in individualized treatment in the reverse waiver procedure. For example, in *State v. Martin*, 191 Wis. 2d 646, 655-56, 530 N.W.2d 420 (Ct. App. 1995), we stated that "[t]he kind and nature of considerations adherent to waiver and sentencing are historically for the legislature to determine." Thus, there is "no fundamental right to individualized sentencing and, by extension, to waiver hearings[.]" *Id.* at 656. The State also relies on *State v. Annala*, 168 Wis. 2d 453, 468, 484 N.W.2d 138 (1992), where our supreme court stated that "there exists no fundamental right to be treated as a juvenile nor is there a fundamental right not [to] be incarcerated for criminal behavior." The State's reliance on these cases is misplaced. These cases analyze substantive due process rights, whereas here, Mann-Tate's arguments are based on procedural due process. Moreover, both of these cases predate the United States Supreme Court's cases described above establishing the important and fundamental differences between juveniles and adults, and we are bound to follow the United States Supreme Court's decisions interpreting the United States Constitution. *See State v. Halverson*, 2021 WI 7, ¶21, 395 Wis. 2d 385, 953 N.W.2d 847.

¶44    The State argues that "every State court to consider the argument Mann-Tate now makes has rejected it," citing numerous decisions from other jurisdictions. However, in each of the cases relied upon by the State, the statutory scheme was fundamentally different than Wisconsin law, and the arguments made by the juveniles in those cases were not the same as the arguments being made by Mann-Tate in this case. For example, in *Zaragoza v. State*, No. 0844, 2021 WL 5296889, slip op. at 7 (Md. Ct. Spec. App. Nov. 15, 2021), the Maryland court

concluded that Maryland's juvenile court statutory scheme did not violate due process where the juvenile was not statutorily entitled to a reverse waiver hearing because the crime the juvenile committed was excluded in the statutes granting reverse waiver for only certain offenses. In other words, "because the circuit court was statutorily prohibited from transferring its jurisdiction over Zaragoza to the juvenile court, whether for trial or for sentencing, the juvenile court could never have acquired jurisdiction over his case." *Id.* The statutory scheme at issue in several other cases cited by the State mirror *Zaragoza*.[13] Although Mann-Tate, like the juveniles in those cases, was subject to original adult court jurisdiction, Mann-Tate is not statutorily prohibited from having his case heard in juvenile court like the juveniles were in these non-Wisconsin cases. That is, none of these cases deal with a juvenile who has a statutory right to a reverse waiver proceeding.

¶45 Finally, the State argues that Mann-Tate may still receive a juvenile disposition if he is convicted of a lesser included offense that does not qualify as an adult original jurisdiction crime. While this assertion is true, it does not solve the problem, because Mann-Tate will still have been denied a meaningful reverse

---

[13] *See, e.g.*, *State v. Watkins*, 423 P.3d 830, ¶16 (Wash. 2018); *State v. B.T.D.*, 296 So. 3d 343, 358 (Ala. Crim. App. 2019); *State v. McKinney*, 46 N.E.3d 179, ¶17 (Ohio Ct. App. 2015); *People v. Patterson*, 25 N.E.3d 526, ¶94 (Ill. 2014); *State v. Jensen*, 385 P.3d 5, 10-11 (Idaho Ct. App. 2016); *State v. Fussell*, 286 So. 3d 1011, 1015-16 (La. 2019); *see also State v. Crooks*, 911 N.W.2d 153, 163-65 (Iowa 2018) (stating that the statute allowing juvenile court to waive jurisdiction and allow a juvenile to be prosecuted in adult criminal court as a "youth offender" did not constitute "punishment" under the Eighth Amendment); *Jones v. State*, 889 S.E.2d 590, 597-98 (S.C. 2023) (holding that the statute excluding certain youth from the definition of "juvenile," and thus, subjecting those youths to adult sentencing, did not violate the Eighth Amendment). Importantly, all but two of these cases involved offenders who were at least sixteen years old at the time they committed the crimes for which they were convicted. One case involved a thirteen-year-old, *Crooks*, 911 N.W.2d at 156, while the other involved a fifteen-year-old, *Patterson*, 25 N.E.3d 526, ¶1. The statute at issue in *Patterson* was later amended to increase the minimum age for mandatory adult court jurisdiction from fifteen to sixteen. *Compare* 705 Ill. Comp. Stat. 405/5-130 (2008) *and Patterson*, 25 N.E.3d 526, ¶1 *with* 705 Ill. Comp. Stat. 405/5-130 (2016).

waiver proceeding. This would be true even if Mann-Tate is not convicted of *any* crime and is instead acquitted at trial. In other words, the State again misidentifies the right at issue in this case. Mann-Tate does not argue that he is entitled to a juvenile disposition. He argues that he is entitled to a meaningful reverse waiver hearing wherein the unique attributes of his youth are considered in the waiver analysis.

## CONCLUSION

¶46 For the foregoing reasons, we conclude that the standard set forth in WIS. STAT. § 970.032(2) for determining whether reverse waiver is appropriate, is unconstitutional to the extent it does not require circuit courts to consider the unique attributes of youth identified by the United States Supreme Court. These attributes include: (1) the juvenile's chronological age related to immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's family and home environment that surrounds him or her; (3) the circumstances of the offense, including the extent of participation in the criminal conduct; (4) the impact of familiar and peer pressures; (5) the effect of the offender's youth on his or her ability to navigate the criminal justice process; and (6) the possibility of rehabilitation. *Miller*, 567 U.S. at 477-78. These factors may take on more or less significance based on the juvenile offender's chronological age, in recognition of the fact that not all juveniles are equally impacted by these unique attributes of youth. *See* *J.D.B.*, 564 U.S. at 279-80.¶

¶47 Although the circuit court concluded that Mann-Tate's age was "the most compelling" factor in favor of transferring jurisdiction to juvenile court, it explicitly disclaimed any reliance on Mann-Tate's age or the impact of his youthfulness on its decision to deny reverse waiver. Accordingly, we reverse the

circuit court's orders and remand the cause to the circuit court to consider the reverse waiver issue anew applying the correct standard of law.

*By the Court.*—Orders reversed and cause remanded for further proceedings.

Recommended for publication in the official reports.